James A. **DOMBROWSKI** et al.

v.

James H. **PFISTER**, Individually, Etc., et al.

Civ. A. No. 14019.

United States District Court
E. D. Louisiana,
New Orleans Division.

Feb. 20, 1964.

Probable Jurisdiction Noted
June 15, 1964.

See 84 S.Ct. 1881.

Milton E. Brener, New Orleans, La., and Kunstler, Kunstler & Kinoy, New York City, A. P. Tureaud, New Orleans, La., for plaintiffs.

Robert J. Zibilich and Hubert, Baldwin & Zibilich, New Orleans, La., for Benj. E. Smith and Bruce C. Waltzer, intervenors.

Jim Garrison and William A. Porteous, III, Asst. Dist. Atty., New Orleans, La., for Jim Garrison, individually and as Dist. Atty. in and for the Parish of Orleans, State of La.

Jack N. Rogers, Baton Rouge, La., for Jas. H. Pfister.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., John E. Jackson, Jr., Asst. Atty. Gen., Baton Rouge,

La., for Jimmie H. Davis, Jack P. F. Gremillion, Thos. D. Burbank, R. R. Willie.

Before WISDOM, Circuit Judge, and ELLIS and WEST, District Judges.

FRANK B. ELLIS, District Judge.

This is a suit by James A. Dombrowski, Executive Director of Plaintiff Southern Conference Educational Fund, Inc. (hereinafter referred to as the SCEF) and the SCEF seeking to have declared unconstitutional LSA–Revised Statutes, Title 14, Sections 358 through 388, referred to as the Subversive Activities and Communist Control Law, and LSA–Revised Statutes, Title 14, Sections 390 through 390.5, referred to as the Communist Propaganda Control Law.

The alleged purpose of the SCEF is to (1) promote the general welfare, and (2) to improve the economic, social and cultural standards of the Southern people in accordance with the highest American democratic institutions and ideals.

Defendants are James H. Pfister, a Louisiana State Representative and Chairman of the Joint Legislative Committee on Un-American Activities of the Louisiana Legislature, Russel R. Willie, a Major in the Louisiana State Police, Jimmie H. Davis, Governor of the State of Louisiana, Jack P. F. Gremillion, Attorney General of the State of Louisiana, Thomas D. Burbank, Commanding Officer of the Division of Louisiana State Police, and Jim Garrison, District Attorney for the Parish of Orleans, State of Louisiana. All parties defendant are sued individually and in their official capacities.

Jurisdiction of the Court over the complaint is sought under Title 28, United States Code, Sections 1331(a), 1343(3) and (4), 2201 and 2202; Title 42, United States Code, Sections 1981, 1983, and 1985.

Plaintiffs basically set forth their cause of action in ten paragraphs set forth in Appendix A.

After suit was filed a petition of intervention and complaint was filed by Benjamin E. Smith and Bruce C. Waltzer (hereinafter referred to as Intervenors). Mr. Smith is Treasurer of the SCEF and Mr. Waltzer is a "friend and supporter" of the SCEF. The petition of intervention and complaint is fully set forth in Appendix B.

Plaintiffs seek that a permanent injunction issue " * * * restraining the defendants, their agents and attorneys from the enforcement, operation or execution of [the statutes in question] and, restraining the defendants, their agents, and attorneys from impeding, intimidating, hindering and preventing the plaintiffs or members, friends and supporters of plaintiff corporation from exercising the rights, privileges, and immunities guaranteed to them by the Constitution and laws of the United States * * *." The complaint terminates with a demand that a declaratory judgment issue declaring the statutes in question void on their face, and null and void as violative of the Constitution of the United States. Plaintiffs requested that a three-judge Court be convened to hear and determine the proceeding.

Intervenors ask for similar relief and also request that Foreman of the Orleans Parish Grand Jury, the individual members thereof and the Honorable Malcolm V. O'Hara, Judge, be made parties defendant. In addendum to the complaint the intervenors ask that a permanent injunction issue restraining the Orleans Parish Grand Jury and the Judge in Charge thereof, the Honorable Malcolm V. O'Hara, from enforcing the statutes in question.

Pursuant to plaintiff's request, a three-judge court was convened by the Honorable The Chief Judge for the Fifth Circuit to hear and determine the controversy.

In open court, and prior to a hearing, the court ordered that the motion for leave of court to intervene be granted, there being no objection by defendants. However, the intervention, insofar as it names the Foreman of the Orleans Parish Grand Jury, the individual members thereof and the judge presently in charge

of the Grand Jury, the Honorable Malcolm V. O'Hara, as parties defendant, is denied.

The first phase of this case was argued on December 9, 1963, and was limited to the constitutionality of the statutes on their face, which was decided in the affirmative by a divided court, and a second hearing was held on January 10, 1964, for the sole purpose of determining after the statute had been constitutionalized whether or not these plaintiffs should be granted a "full blown" trial on the merits, in an attempt to show an unconstitutional application.

In considering this application the judges in the majority have assumed to be true all of the averments made in the petition.

Generally it may be soundly said that if the statutes in question are constitutional then the State Grand Jury, its Foreman, the Judge in charge and other state law enforcement officials may validly proceed with the enforcement and operation of same; and if the statutes are unconstitutional, the proper state or federal court, upon proper application by parties affected, would be the competent forum to enjoin the enforcement and operation of the statute by all officials.

The pleadings reveal that the plaintiffs and intervenors have been engaged, among other things, in urging the southern negro to exercise his constitutional rights to vote, to attend the school of his choice, and to have and enjoy all rights which are foreclosed to him by segregation barriers. The Court would like to first point out that these endeavors, if properly sought, are praiseworthy indeed for we will never enjoy a first class democracy as long as there walks second class citizens among the nearly two hundred million Americans.

However, this should never operate as to bar the state from proceeding in an orderly manner to enforce its own protective statutes, particularly where the federal government has not pre-empted the field. The State should, and does, have the right to determine in an orderly manner which organization or organizations are primarily or secondarily designed to overthrow, destroy, or to assist in the overthrow or destruction of the constitutional form of local government by violence, force or any other unlawful means.

Can we deny the State the basic right of self-preservation; the right to protect itself? If so, truly this would be a massive emasculation of the last vestige of the dignity of sovereignty. This brings us to the specific statutes in question and the injunction requested.

"Federal injunctions against state criminal statutes either in their entirety or with respect to their separate and distinct prohibitions, are not to be granted as a matter of course, even if such statutes are unconstitutional," Watson v. Buck, 313 U.S. 387, 400, 61 S.Ct. 962, 966, 85 L.Ed. 1416. Federal Courts traditionally have refused, except in rare instances to enjoin criminal prosecutions under state penal laws. This principal is impressively reinforced when not merely the relations between coordinate courts, but between coordinate political authorities are in issue, Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138. This has been manifested in numerous decisions of the Supreme Court involving a State's enforcement of its criminal law, e. g. Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324; Watson v. Buck, supra; Beal v. Missouri Pacific Railroad Corp., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577; Cleary v. Bolger, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390.

Also see England v. Louisiana State Board of Medical Examiners, 84 S.Ct. 461, wherein Mr. Justice Douglas, in a special concurring opinion, uses the following language setting forth the circumstances under which the federal injunctive power has been denied.

"A federal court will normally not entertain a suit to enjoin criminal prosecutions in state tribunals, with review of such convictions by this Court being restricted to constitutional issues. Beal v. Missouri Pac.

R. Co., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577. A federal court declines to entertain an action for declaratory relief against state taxes because of the federal policy against interfering with them by injunction. Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407. Where state administrative action is challenged, a federal court will normally not intervene where there is an adequate state court review which is protective of any federal constitutional claim. Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424; Alabama Public Service Comm'n v. Southern R. Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002. The examples could be multiplied where the federal court adopts a hands-off policy and remits the litigants to a state tribunal."

These basic principles have been qualified under exceptional circumstances to allow interference when there is a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights, Spielman Motor Sales Company v. Dodge, 295 U.S. 89, 55 S.Ct. 678, 79 L.Ed. 1322; Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255; Packard v. Banton, 264 U.S. 140, 44 S.Ct. 257, 68 L.Ed. 596; Tyson & Bro. United Theatre Ticket Offices v. Banton, 273 U.S. 418, 47 S.Ct. 426, 71 L.Ed. 718; Cline v. Frink Dairy Company, 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146; City of Houston v. Jas. K. Dobbs Company of Dallas, 5 Cir., 232 F.2d 428; Morrison v. Davis, 5 Cir., 252 F.2d 102; United States v. Wood, 5 Cir., 295 F.2d 172.

Assuredly the Supreme Court did not intend to countenance the application of this exception to the use of injunctive process by the federal system in such a way as to deprive the state and local courts of this nation in the exercise of their sovereign rights of self-protection. This Court should jealously guard these plaintiffs in their constitutional rights to equal protection of the laws, yet in our zeal to protect we should not consciously or unconsciously undermine the whole fabric of state and federal relationship as it struggles to survive its inherent constitutional posture.

The instant case postulates the basic constitutional issue whether threatened prosecution in the state courts imbued as it is with an aura of sedition or treason or acts designed to substitute a different form of local government by other than lawful means, may properly be blocked and effectively thwarted by Federal action.[1]

■ The general rule of Watson v. Buck, supra, is to be applied where the paramount right of a state to self-preservation is at issue.

Mr. Justice Frankfurter, for the majority of the court, cautioned us in Stefanelli v. Minard, supra, 342 U.S. at pages 123–124, 72 S.Ct. at pages 121–122, 96 L.Ed. 138, that

"[W]e would expose every State criminal prosecution to insupportable disruption. Every question of procedural due process of law—with its far-flung and undefined range—would invite a flanking movement against the system of State courts by resort to the federal forum, with review if need be to [the Supreme] Court to determine the issue."

---

1. None of the cases cited involved so fundamental an element of state sovereignty as that of self-preservation, e. g. Spielman contested the New York Code of Fair Competition for the Motor Vehicle Retailing Trade; Terrace contested a Washington law forbidding aliens from owning land; Packard contested a New York law requiring motor carriers to post a bond; Tyson contested a New York law forbidding resale of tickets to the theatre, etc., as a price in excess of fifty cents of its printed value; Cline tested the Colorado Anti-Trust Act; City of Houston involved an ordinance forbidding the sale of food to airlines by other than franchised concessionaires; Morrison involved the desegregation of the New Orleans public transit system; and Wood involved voter intimidation.

■■ The Court will not presuppose incompetency or inability of the State Court judges to enforce federally protected constitutional rights. If the evidence has been illegally seized, it may be so declared in those courts; if the statutes in question are unconstitutional, they may be so declared by those Courts, Courts of Appeal, State Supreme Court, and an unsatisfied litigant still has ample opportunity for ultimate review by the United States Supreme Court of the federal questions involved, Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927. A three-judge federal court should not be used as a vehicle to enjoin future enforcement of state statutes, constitutional or otherwise, Watson v. Buck, supra.

■ Nor is the instant case similar to Aelony v. Pace and Harris v. Pace, Civil Actions Nos. 530 and 531 respectively, Middle District of Georgia, decided Nov. 1, 1963, —— F.Supp. ——, for those cases involved the enjoining of a threatened prosecution under the Georgia "Insurrection Statute" which has been held unconstitutional in its application in Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066, and the "Unlawful Assembly Statute" which had just recently been held unconstitutionally vague in Wright v. Georgia, 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349.[2] The Aelony and Harris cases involved the purely unconstitutional situation of a defendant being held without bail for a misdemeanor.[3]

It was said by Mr. Justice Holmes in The Sacco-Vanzetti Case, Transcript of the Record 5516, that "[t]he relation of the United States and the Courts of the United States is a very delicate matter that has occupied the thoughts of statesmen and judges for a hundred years and cannot be disposed of by a summary statement that justice requires me to cut red tape and to intervene."

This brings us first to the narrow question of supersession, that is, or whether the State of Louisiana can investigate, indict and prosecute for sedition, subversion, or communist activity directed against the state or local government.

First of all the statutes differ from the others found in Title 14 of the Louisiana Revised Statutes, better known as the Louisiana Criminal Code, in that the balance of the Code deals with the protection of the individual member of society, whereas, the statutes under consideration deal solely with the protection of the constitutional form of local government chosen collectively by all of the members of society.

Louisiana is not the only state in the Union with sedition or treason or subversive activities and communist control laws. [See Appendix C]

Com. of Pennsylvania v. Nelson, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640, involved the first such statute to be subjected to constitutional interpretation. Defendant-Respondent Steve Nelson, an acknowledged communist, was convicted under Section 207 of the Pennsylvania Penal Code, commonly referred to as the Pennsylvania Sedition Act which pro-

2. It is significant to note that the Herndon and Wright cases both found their way to the United States Supreme Court via the state courts, and not by the flanking-movement to a three-judge federal district court.

3. The dissenting opinion, per Judge Elliott, correctly points out that the equity powers of a federal court should not be invoked to interfere by injunction with threatened criminal prosecutions in a state court. He further states that " * * * I would require the assessment of reasonable bail in those instances where no bail has been assessed. I would

impinge no further upon the prerogatives of the state courts. * * *" After stating that the constitutionality of the same statutes were then pending before the Supreme Court of Georgia, he continues, " * * * For us at this time to deal with the same questions about to be considered by the Supreme Court of the state strikes me as being an unwarranted interference with an embarrassment to the state court proceedings and a breach of those principles of comity historically governing the relations between the courts of the states and the courts of the United States."

scribed sedition against the State of Pennsylvania *and* the United States. He was sentenced to imprisonment for twenty years and was ordered to pay a fine of $10,000.00 and to pay the costs of prosecution in the sum of $13,000.00. The Superior Court affirmed and the Supreme Court of Pennsylvania reversed on the narrow issue of supersession of the state law by the Federal Smith Act, 18 U.S.C.A. § 2385.

The United States Supreme Court affirmed, "[s]ince we find that Congress has occupied the field to the exclusion of parallel state legislation, that the dominant interest of the Federal Government precludes state intervention, and that administration of state Acts would conflict with the operation of the federal plan, we are convinced that the decision of the Supreme Court of Pennsylvania is unassailable." Com. of Pennsylvania v. Nelson, supra, 350 U.S. at page 509, 76 S.Ct. at page 484, 100 L.Ed. 640.

Thus it appeared that the federal government had completely pre-empted the field of sedition against the State and Federal Governments.[4] The question then arose as to whether the "exclusion of parallel state legislation precluded the state from protecting itself from sedition."[5]

The question was laid to rest in Uphaus v. Wyman, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090:

"In Nelson itself we said that the 'precise holding of the court * * * is that the Smith Act * * * which prohibits the knowing advocacy of the overthrow of the government of the United States by force

and violence, supersedes the enforceability of the Pennsylvania Sedition Act which proscribed the *same conduct*.' (350 U.S. at 499 [76 S.Ct. at 478, 100 L.Ed. 640]) The basis of Nelson thus rejects the notion that it stripped the States of the right to protect themselves. All the opinion proscribed was a race between federal and state prosecutors to the courthouse door. The opinion made clear that a State could proceed with *prosecutions* for sedition against the State itself; that it can legitimately investigate in this area follows a fortiori." (360 U.S. at 76, 79 S.Ct. at 1044, 3 L.Ed.2d 1090) (Italics supplied)

"Nor did our opinion in Nelson hold that the Smith Act had proscribed state activity in protection of itself either from actual or threatened 'sabotage or attempted violence of all kinds.'" (360 U.S. at 77, 79 S.Ct. at 1044, 3 L.Ed.2d 1090)[6]

■ Thus it would appear that the state may validly proceed with prosecutions of sedition, treason, subversive activities and communist activities, carried on within the State and directed at the State alone.[7] It is unnecessary, therefore, and this court will not pass on the constitutionality of the Communist Propaganda Control Law and will also leave to the State Courts the questions of unfounded search warrants and warrants of arrest, improper use by the Joint Legislative Committee of the documents allegedly improperly seized, etc.

■ If the action taken by this Court on January 10, 1964, is construed as val-

4. The Nelson subsequently received critical comments of the prevailing view in various law journals, 6 Am.U.L.Rev. 53; 6 De Paul L.Rev. 155; 30 So.Cal.L.Rev. 101; 10 Vanderbilt L.Rev. 144; 31 Washington L.Rev. 300.

5. Subsequently and upon the strength of Nelson, the Louisiana Supreme Court declared an entire package of State Legislation on Communist Control as unconstitutional, see State v. Jenkins, 236 La. 300, 107 So.2d 648.

6. After the Uphaus decision the Louisiana Legislature enacted the statutes in question deleting the prohibitive language making it a crime to advocate the overthrow of the United States Government. Act 270 of 1962, LSA–R.S. 14:358–388.

7. This is also the prevailing view expressed in a number of legal periodicals, e. g. 73 Harvard L.Rev. 163; 20 Louisiana L.Rev. 599; 28 Geo. Washington L.Rev. 461; 38 Texas L.Rev. 334.

idating the Communist Control Act as to its constitutionality this action is, of the Court's own motion, hereby vacated, the Court here refraining from taking any action in advance of appropriate proceedings in the State Courts at the State level. All these matters we commit to the hands of the state criminal tribunals who are equally competent to conscientiously apply protected constitutional rights, subject, of course, to proper supervision by the State Appellate-level courts and the United States Supreme Court.

A very recent case dealing with the State's overriding and compelling interest and how it is affected by the Fourteenth Amendment is Jordan v. Hutcheson, 4 Cir., 323 F.2d 597, wherein it was pointed out that:

"When the court does act under the Fourteenth Amendment it must weigh the state's interest in the product of this effort against the interest of the citizen in his constitutional rights. Only if the state's interest is overriding and compelling will the courts condone an invasion of those rights for which the plaintiffs here seek protection." (Footnote omitted)

The case at bar presents one of the most basic and compelling interests that the state could have, i. e. the basic interest of self-preservation and the right to enforce this interest in a lawful manner, through its grand juries and district attorneys, the organic law of the state protecting it against subversion and treason where directed against the state alone.

Moreover, the Jordan case, supra, dealt with an injunction directed to a state legislative committee as distinguishable from the instant case which strikes at the very heart of the state's organic authorities dealing with law and order.

It has also been urged upon us that this very court has declared LSA–Revised Statutes 14:385 as unconstitutional, State of La. ex rel. Gremillion v. NAACP, D. C., 181 F.Supp. 37, probable jurisdiction noted, 364 U.S. 869, 81 S.Ct. 112, 5 L.Ed. 2d 90, affirmed 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301. The Court would like to point out that that case involved the unconstitutional application of the statutes to the National Association for Advancement of Colored People, a valid, lawful, private activity. Whether or not these statutes may be constitutionally applied to an invalid, unlawful, secret activity remains an open question which we likewise commit into the hands of the state tribunals.[8]

During the first hearing of the matter it was indicated that the court would hear the arguments on the motion to quash and on the constitutionality of the act insofar as the face of it was concerned. It was determined that if the Court should hold the statute constitutional on its face that there would be another hearing for the reception of evidence. A second hearing was held on the question of whether a full trial would be permitted to show unconstitutional application.

 The Court is of the opinion that a hearing for the admission of evidence is not necessary where only questions of law are presented, and where plaintiff's allegations for the purpose of this motion were admitted to be true and would not either in law or in fact entitle him to injunctive relief, Securities & Exchange Commission v. Graye, D.C., 156 F.Supp. 544; Schlosser v. Commonwealth Edison Company, 7 Cir., 250 F.2d 478, cert. den. 357 U.S. 906, 78 S.Ct. 1150, 2 L.Ed.2d 1156; Cf. Sewell v. Pegelow, 4 Cir., 291 F.2d 196, and if a hearing reveals that plaintiff has not stated a claim upon which relief can be granted, and cannot state such a claim, the court may dispose of the case finally by dismissing the complaint. Mast, Foos & Company v. Stover Mfg. Co., 177 U.S. 485, 20 S.Ct.

8. See People of State of New York ex rel. Bryant v. Zimmerman, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184, wherein the Court held constitutional a similar statute curtailing the activities of the Klu Klux Klan stating that the First Amendment does not protect associations for unlawful purposes.

708, 44 L.Ed. 856, and that is what this court proposes to do.

Plaintiffs argued vociferously that the Court should hold a special hearing for the reception of evidence that these statutes, if constitutional, have been unconstitutionally applied as to them. This court will not gainsay the rule that evidence has been frequently admitted to show unconstitutional application of statutes. NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488; Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301; Gibson v. Florida, 372 U.S. 539, 83 S.Ct. 889, 9 L. Ed.2d 929; NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405; but here the very vitals of our constitutional system of government are on the line.

The reception of evidence is a double-edged blade. It will cut to the quick both ways. If plaintiffs are permitted to introduce evidence of an unconstitutional application of the statutes, respondents would certainly be entitled to follow with evidence that the individual plaintiff is a Communist and that the corporate plaintiff is a Communist-fronted organization, and that the statute, as applied, was a constitutional application. In effect, these litigants, plaintiffs, defendants and intervenors, would indulge in a Star Chamber proceeding with all the "foldorol" and publicity attendant therewith.

For the good of all it is to be hoped that this case will reach the Supreme Court so that the matter of State-Federal relations in the judicial field may be clarified. If the federal district judges are to act as a police force to ride herd over state and municipal courts then we had best be so instructed and the matter for once and for all laid to rest along with a vital part of the state judicial system already weakened by a constant federal encroachment in both the statutory and judicial fields.

This country was nurtured to maturity by leaders who, in the nineteenth century, constantly alerted the people of this nation to the danger of giving preferential treatment to any one branch of our three-pronged governmental system over the other. Apprehension was expressed by Jefferson when he stated:

"The great object of my fear is the Federal Judiciary. That body, like gravity, ever acting with noiseless foot, and in alarming advance, gaining ground step by step, and holding what it gains, is engulfing insiduously the [State] governments into the jaws of that which feeds them." Thomas Jefferson to Spencer Roane (1821)

We must stride forward at all times to purify our democracy but let it not be said that the judiciary functioning as both a court and a congress took away inherent rights from one group, religious, ethnic, etc., in our society in order to bestow it upon another. All should be treated alike.

The application for the injunction will be denied and the suit dismissed, each party to bear its own costs, for failure to state a claim upon which relief can be granted.

WEST, District Judge, concurs.

### APPENDIX A

### THE CAUSE OF ACTION AS ALLEGED IN THE COMPLAINT

11. The defendants herein, under color of certain statutes of the State of Louisiana, have allegedly entered into a plan or conspiracy with other persons to the plaintiffs unknown to subject or cause to be subjected the plaintiffs, citizens of the United States, to the deprivation of rights, privileges and immunities secured to them by the Constitution and laws of the United States.

12. Pursuant to this plan or conspiracy the defendants have attempted to and threaten to continue to attempt to prosecute the individual plaintiffs under the color and authority of certain state statutes, namely LSA–Revised Statutes 14:-358 et seq. and 14:390 et seq.

13. Defendants Pfister and Willie, so say the plaintiffs, without proper legal authority, attempt to institute the prose-

cution of the individual plaintiffs by obtaining on October 2, 1963, certain warrants of arrest as well as search warrants based upon sworn affidavits alleging that the plaintiffs had conspired to violate the aforementioned statutes. These arrest and search warrants were served and acted upon by police officers under the control of the defendants herein. Despite the fact that the warrants of arrest were summarily vacated by a state Criminal District Court for the Parish of Orleans which gave the plaintiffs, without delay, the full relief sought upon a holding that there was no probable cause for the issuance of the warrants, defendant Pfister nevertheless threatened and continues to threaten to attempt to obtain new prosecutions of the plaintiffs and to hold legislative hearings under the same statutes.

14. It is averred that on Friday, November 8, 1963, the Joint Legislative Committee on Un-American Activities of the Louisiana Legislature held an "open hearing" in Baton·Rouge, Louisiana, at which hearing defendant Pfister, as well as counsel for the said committee, Rogers, utilized photostats of certain documents seized on October 4, 1963, under the alleged authority of the aforesaid search warrants. The Committee thereupon adopted a resolution naming plaintiffs corporation as a "communist front" and further calling upon defendant Garrison to prosecute officials of this corporation including plaintiff Dombrowski, under the provisions of the statutes herein cited. Pfister and Rogers have further publicly announced their intention of delivering to Garrison copies of documents illegally seized from the plaintiffs for the purpose of presenting the said copies to the Orleans Parish Grand Jury and for institution of criminal proceedings under the same statutes.

15. It is alleged that LSA–Revised Statutes 14:358 through 14:388 and LSA–Revised Statutes 14:390 through 14:390.5 are void and illegal on their face as applied to the plaintiffs herein, in that they violate the Constitution of the United States and in particular the First, Fourth, Fifth, Eighth and Fourteenth Amendments thereto. These state statutes violate the fundamental guarantees of free speech, press, assembly and the right to petition the government for a redress of grievances. They violate the guarantee of due process of law in that they are vague and indefinite and fail to meet the requirements of certainty in criminal statutes. They violate the prohibitions against ex post facto legislation and bills of attainder and represent an unconstitutional delegation of legislative power, all in violation of the Constitution of the United States.

16. ˙ The aforesaid state statutes are likewise void and illegal and of no force or effect in that they invade areas preempted to the exclusive jurisdiction of the United States by statutes and laws enacted by the Congress of the United States.

17. Pursuant to the aforesaid conspiracy and plan the defendants have threatened and continue to threaten to enforce the said unconstitutional void and illegal state statutes against the plaintiffs herein for the sole purpose of subjecting and causing to be subjected the plaintiffs and the members, friends and supporters of the plaintiff corporation to the deprivation of rights, privileges and immunities secured to them by the Constitution and laws of the United States.

18. The plaintiffs and the members, friends and supporters of the plaintiff corporation have been attempting through peaceful and non-violent means to achieve the elimination of all forms of racial segregation in the states of the South and the State of Louisiana and to assist and encourage Negro citizens to exercise their rights to register and vote in federal and state elections. These objectives are specifically protected and guaranteed by the Constitution of the United States and the Thirteenth, Fourteenth and Fifteenth Amendments thereto. In their constant efforts to achieve these constitutionally protected efforts, the plaintiffs and the members, friends and supporters of the plaintiff corporation have been attempting to exercise

rights guaranteed under the First and Fourteenth Amendments to freedom of speech, press, assembly and association and the right to assemble, associate and petition for a redress of grievances.

19. Unless this Court restrain the operation and enforcement of these void, invalid and unconstitutional state statutes, the plaintiffs, and the members, friends and supporters of the plaintiff corporation will suffer immediate and irreparable injury.

The sole purpose, intention and effect of threatening to enforce said statute is to deter, intimidate, hinder and prevent the plaintiffs and the members, friends and supporters of plaintiff corporation from exercising their fundamental constitutional rights guaranteed under the First and Fourteenth Amendments in their efforts to enforce the equality under the law guaranteed by the Thirteenth, Fourteenth and Fifteenth Amendments.

It is prayed that unless this court restrains the operation and enforcement of these void, invalid and unconstitutional state statutes, the plaintiffs and the members, friends and supporters of the plaintiff corporation will continue to suffer the most serious, immediate and irreparable injury in that they will continue to be deterred, intimidated, hindered and prevented from exercising elementary and fundamental Federal constitutional rights.

It should be noted that the only time these plaintiffs sought relief in a state tribunal the relief was forthwith granted by the state criminal district court.

## APPENDIX B

### PETITION OF INTERVENTION AND COMPLAINT

The petition of intervention and complaint of Benjamin E. Smith and Bruce C. Waltzer, plaintiffs in intervention for their verified petition allege that:

#### I.

Benjamin E. Smith and Bruce C. Waltzer are both citizens of the State of Louisiana and the United States of America and are attorneys at law admitted to practice before the State and Federal bars;

#### II.

That plaintiffs in intervention, Benjamin E. Smith and Bruce C. Waltzer, both were illegally arrested on the same date as plaintiff, James A. Dombrowski, and under color of warrants of arrest similarly drawn as to those affecting James A. Dombrowski;

#### III.

That records and confidential legal files belonging to plaintiffs in intervention, Benjamin E. Smith and Bruce C. Waltzer, were illegally seized under color of search warrants similarly drawn as to those affecting James A. Dombrowski and Southern Conference Educational Fund, Inc.;

#### IV.

That plaintiffs in intervention, Benjamin E. Smith and Bruce C. Waltzer are also under threat of imminent prosecution and harassment by Legislative bodies under color of authority granted in LSA—Revised Statutes 14:358 et seq. and 14:390 et seq. and are further under imminent danger of having action taken by the duly constituted Grand Jury for the Parish of Orleans.

Petitioners are plaintiffs in intervention and show that after their illegal arrest they applied to the Criminal District Court for the Parish of Orleans for a preliminary hearing pursuant to State Law under proceedings entitled Benjamin E. Smith, et al. versus State of Louisiana, et al., No. 181–975, Section "E"; that said hearing was held upon their application and the Judge of the said Court discharged plaintiffs in intervention for the reason that no legal evidence was adduced sufficient to bind them over and further no legal evidence was adduced sufficient to justify the issuance of the warrants of arrest previously mentioned herein;

That James A. Dombrowski filed a similar pleading in the State Court which was consolidated for hearing with the pleadings filed by Benjamin E. Smith

and Bruce C. Waltzer and James A. Dombrowski was similarly discharged.

Plaintiff in intervention, Benjamin E. Smith, serves as Treasurer of Southern Conference Educational Fund, Inc., while James A. Dombrowski serves as its Executive Director. Plaintiff in intervention, Bruce C. Waltzer is a friend and supporter of Southern Conference Educational Fund, Inc., and has appeared as such at some of its public functions.

Plaintiffs in intervention, Benjamin E. Smith and Bruce C. Waltzer as attorneys at law have represented and counselled the legal interest of Southern Conference Educational Fund, Inc.

For their verified complaint, plaintiffs in intervention, Benjamin E. Smith and Bruce C. Waltzer allege:

### I.

That they adopt all of the allegations contained in the petition entitled James A. Dombrowski & Southern Conference Educational Fund, Inc., versus James H. Pfister, Russel R. Willie, Jimmie H. Davis, Jack P. F. Gremillion, Colonel Thomas D. Burbank, Jim Garrison;

### II.

Further, that they are informed and believe that various documents and confidential legal files seized from them have been subpoenaed by the Grand Jury for the Parish of Orleans and that the said Grand Jury could meet momentarily for purposes of returning either indictments or No True Bills under 14:358 et seq. and 14:390 et seq., which statutes plaintiffs in intervention, Benjamin E. Smith and Bruce C. Waltzer reiterate are unconstitutional on their face;

### III.

That plaintiffs in intervention, Benjamin E. Smith and Bruce C. Waltzer are informed and believe that the Honorable Malcolm V. O'Hara, Judge of the Criminal District Court, presently in charge of the Orleans Parish Grand Jury, has pursuant to the said aforementioned statutes, which plaintiffs reiterate are unconstitutional, instructed the Grand Jury for the Parish of Orleans to investigate whether there are or have been any violations under the said statutes;

### IV.

Plaintiffs in intervention Benjamin E. Smith and Bruce C. Waltzer aver that it is necessary not only that they be permitted to intervene in this suit, but that they be permitted to join as parties defendant the Foreman and individual members of the Orleans Parish Grand Jury, namely: Messrs. Harry Plant, Foreman, John Leslie Bonnett, John Donelson Eagan, Andrew F. Gonczi, Jr., Rufus Louis Matthews, John Thomas McNamara, George Josiah Marsh, Joseph Hillary Morvant, Lloyd H. Pierre, James Craig Roth, Robert Mallard Seago, Sr., and Edward Alvis Hodge and the Honorable Malcolm V. O'Hara, Judge of the Criminal District Court, who is presently in charge of the Orleans Parish Grand Jury.

### APPENDIX C

ALABAMA

Code of Alabama, Title 14, Sections 22(1) and 22(2), Sections 97(1) through 97(8).

ALASKA

Sedition Act, Alaska Statutes 1962, Section 11.50.010 et seq.

ARIZONA

Arizona Revised Statutes, Title 16, Sections 205 and 206.

ARKANSAS

Arkansas Statutes, Title 41, Sections 4125 through 4131.

CALIFORNIA

California Codes, Title 5, Chapter 1, Sections 35000–35007.

COLORADO

Colorado Revised Statutes, Chapter 40, Article 23, Section 7.

CONNECTICUT

Conn.Gen.Stat.Ann. Title 53, Sections 1 through 8.

DELAWARE

Delaware Code Annotated, Title 11, Chapter 3, Subchapter LII, Sections 861 through 863.

FLORIDA

Florida Statutes Annotated, Title 44, Chapter 876, Sections 1 through 4, F.S.A.

GEORGIA

Georgia Code Annotated, Title 26, Chapter 9A, Sections 901a through 912a.

HAWAII

Revised Laws of Hawaii, Title 40, Chapter 361, Sections 1 through 12.

IDAHO

Idaho Constitution, Article 5, Section 5.

ILLINOIS

None.

INDIANA

Burns Indiana Statutes, Title 10, Chapter 52, Sections 5201 through 5209.

IOWA

Iowa Code Annotated, Chapter 689, I.C.A.

KANSAS

Corrick's General Statutes, Chapter 21, Article 3, Sections 301 through 308.

KENTUCKY

Kentucky Revised Statutes, Chapter 432, Section 010 et seq.

LOUISIANA

LSA–Revised Statutes, Title 14, Sections 358 through 388 and 390 through 390.5.

MAINE

Revised Statutes of Maine, Chapter 143, Section 4.

MARYLAND

Michie's Annotated Code of Maryland, Article 85A, Sections 1 through 19.

MASSACHUSETTS

Massachusetts General Laws Annotated, Chapter 264, Sections 16 through 23.

MICHIGAN

Rice's Michigan Statutes Annotated, Title 28, Chapter 84, Sections 812 through 813(4), Comp.Laws 1948, Supp.1956, §§ 750.544–750.545d.

MINNESOTA

Minnesota Constitution, Article 1, Section 9.

MISSISSIPPI

Mississippi Code Annotated, Sections 4194.01 through 4194.10.

MISSOURI

Missouri Revised Statutes, Chapter 562.

MONTANA

Smith's Revised Code of Montana, Chapter 44, Sections 4401 through 4410.

NEBRASKA

Revised Statutes of Nebraska, Title 28, Article 7(i), Sections 747 through 750.

NEVADA

Nevada Constitution, Article 1, Section 19.

NEW HAMPSHIRE

New Hampshire Revised Statutes Annotated, Chapter 588, Sections 1 through 16.

NEW JERSEY

New Jersey Statutes Annotated, Title 2A, Chapter 148, Articles 1 through 5.

NEW MEXICO

None.

NEW YORK

McKinney's Consolidated Laws of New York, c. 40, Penal Code, § 2380.

NORTH CAROLINA

Michie's General Statutes of North Carolina, Chapter 14, Articles 3 through 3A.

NORTH DAKOTA

North Dakota Constitution, § 19; North Dakota Code Annotated, Title 12, Chapter 7, Section 1 et seq.

**OHIO**

Baldwin's Ohio Revised Code & Service, Title 29, Chapter 2921, Sections 1 through 27.

**OKLAHOMA**

Oklahoma Statutes Annotated, Title 21, Chapter 52, Sections 1266.1 through 1266.11 and 1267.1 through 1267.2.

**OREGON**

Oregon Constitution, Article I, Section 24.

**PENNSYLVANIA**

Purdon's Pennsylvania Statutes, Title 18, Section 3811.

**RHODE ISLAND**

General Laws of Rhode Island, Title 11, Chapter 43, Sections 11 through 14.

**SOUTH CAROLINA**

Code of Laws of South Carolina, Title 16, Chapter 9, Sections 581 through 589.

**SOUTH DAKOTA**

South Dakota Code, 13.0701.

**TENNESSEE**

Tennessee Code Annotated, Title 39, Chapter 44, Sections 4405, 4420 through 4423.

**TEXAS**

Vernon's Texas Civil Statutes, Title 120A, Article 6889–1.

**UTAH**

Utah Constitution, Article 1, Section 19.

**VERMONT**

Vermont Statutes Annotated, Title 13, Chapter 67, Section 3405.

**VIRGINIA**

Code of Virginia, Title 18, Chapter 8, Article 1, Sections 418 through 422.

**WASHINGTON**

Revised Code of Washington Annotated, Title 9, Chapter 81, Sections 10 through 130j.

**WEST VIRGINIA**

West Virginia Code of 1961, Sections 5908 et seq.

**WISCONSIN**

West's Wisconsin Statutes Annotated, Section 946.03.

**WYOMING**

Michie's Wyoming Statutes, Title 9, Chapter 3, Section 693 through 699.

End

WISDOM, Circuit Judge (dissenting).

I respectfully dissent.

The main issue in this case is not, as the majority opinion declares, "the State's basic right of self-preservation". No one questions this right.

The main issue is whether the State [9] is abusing its legislative power and criminal processes: whether the State, under the pretext of protecting itself against subversion, has harassed and humiliated the plaintiffs and is about to prosecute them solely because their activities in promoting civil rights for Negroes conflict with the State's steel-hard policy of segregation. They ask the federal court to defend their federally protected rights.

The Court declined to act on the constitutional issues the case presents and refused the plaintiffs an opportunity to

9. The prime mover against the plaintiffs is the Joint Legislative Committee on Un-American Activities of the Louisiana Legislature. The plaintiffs sued James H. Pfister, Chairman of that Committee, individually and as Chairman. The other defendants are Jimmie H. Davis, Governor of the State; Jack P. F. Gremillion, State Attorney General; James Garrison, District Attorney for the Parish of Orleans; Thomas D. Burbank, Commanding Officer of the State Police; and Russel R. Willie, a Major in the State Police. For convenience, the majority opinion speaks of all or some of these individuals when it uses the term "State". I do the same.

Also for convenience, "plaintiffs" includes "intervenors" and the Louisiana Anti-subversion Law refers both to LSA–R.S. 14:358–388, The Subversive Activities and Communist Control Law, and LSA–R.S. 14:390–390.5, the Communist Propaganda Control Law.

offer evidence in proof of their case.[10] It is not clear why it did. To me, the majority's decision appears to rest on a sort of visceral feeling that somehow, if relief were granted, the Court would be impinging on States' Rights.

The concept of the States as political bodies rather than administrative units of the national government tends to fractionate power, preserve regional differences, encourage home rule, and promote democracy at all levels of government. These characteristics of American federalism are essential to the kind of government I want to live under. I say, however, with the Madison of the Constitutional Convention:

"Was, then, the American Revolution effected, was the American Confederacy formed, was the precious blood of thousands spilt, and the hard-earned substance of millions lavished, not that the people of America should enjoy peace, liberty, and safety, but that the government of the individual States * * * might enjoy a certain extent of power and be arrayed with certain dignities and attributes of power? * * * [A]s far as the Sovereignty of the States cannot be reconciled with the happiness of the peole, the voice of every good citizen must be, Let the former be sacrificed to the latter." (Emphasis added.) [11]

"States' Rights" are mystical, emotion-laden words. For me, as for most Southerners, the words evoke visions of the hearth and defense of the homeland and carry the sound of bugles and the beat of drums. But the crowning glory of American federalism is not States' Rights. It is the protection the United States Constitution gives to the private citizen against *all* wrongful governmental invasion of fundamental rights and freedoms.

When the wrongful invasion comes from the State, and especially when the unlawful state action is locally popular or when there is local disapproval of the requirements of federal law, federal courts must expect to bear the primary responsibility for protecting the individual.[12] This responsibility is not new. It did not start with the School Segregation

---

10. The plaintiffs have offered the affidavits of Dr. Martin Luther King, Rev. Fred L. Shuttlesworth, Rev. C. T. Vivian, Dr. Herman Long, and Bishop Edgar A. Love. Ben Smith, Bruce Waltzer, Dr. Dombrowski and others are prepared to testify.

11. The Federalist, No. XLV

12. "[T]he principal, if not the only, reason for establishment of the lower courts was the need for dealing with local opposition to, or disregard of, the federal law. Unless they perform this function adequately, there is little reason to have them at all. * * * And it is quite clear that the reason Congress was given such power, and presumably the basic reason for the existence of the federal courts which Congress did establish forthwith was the need for national tribunals to enforce the national law in the teeth of local resistance." Lusky, Racial Discrimination and the Federal Law: A Problem in Nullification, 63 Col.L.Rev. 1163, 1178 (1963). Similarly, Mr. Justice Douglas, who must be shocked at the thought that this Court quoted his opinion in England v. Louisiana State Board of Medical Examiners, 84 S.Ct. 461, 471, in support of the result reached here, said in that opinion: "Today we put federal jurisdiction in jeopardy. As the Court says there are many advantages in a federally constructed record. Moreover, federal judges appointed for life are more likely to enforce the constitutional rights of unpopular minorities than elected state judges. * * * The Court recognizes the value to the litigants of being in the federal court. * * * The value of the independence of federal judges, and the value of an escape from local prejudices when fact findings are made are considerable ones." Justice Douglas quoted Madison with regard to the problem when the creation of lower federal courts was being mooted: "What was to be done after improper verdicts, in state tribunals, obtained under the biased directions of a dependent judge, or the local prejudices of an undirected jury? To remand the cause for a new trial would answer no purpose. To order a new trial at the supreme bar would oblige the parties to bring up their witnesses, though ever so distant from the seat of the court. An effective judiciary establishment, commensurate to the legislative authority, was essential. A government

Cases. It is close to the heart of the American Federal Union. It is implicit in the replacement of the Articles of Confederation by the Constitution. It makes federalism workable.

The distinguishing feature of this case, which the majority chooses to ignore, is the contention that the State, under the guise of combatting subversion, is in fact not using its laws for a proper governmental objective but is abusing its laws by punishing the plaintiffs for their advocacy of civil rights for Negroes. It so happens that the plaintiffs contend that the Louisiana Anti-Subversion Law is unconstitutional and, besides, has been superseded by congressional legislation. If those contentions are sound, unquestionably the plaintiffs have a right to relief in the federal court. But the deep thrust of the complaint is the State's abuse of its power as to these plaintiffs. If the evidence on this point should support the plaintiffs, they would be entitled to relief—even if the law were clearly constitutional.

It is true that some law-violators, caught in the act, say "You can't do that to me", and shout "Civil Rights" in an effort to escape just punishment. But it is also true, and every judge in this circuit knows it, that in some cases, all too many cases, persons have been punished without any justifiable basis or punished cruelly beyond the bounds of just punishment for a minor offense, to serve as an object lesson to others, because they opposed the State's policy of segregation.[13] The plaintiffs assert that this is such a case. There is, therefore, no substance to the majority's argument that the federal court is here being asked to interfere with orderly state criminal processes, and that if the Court granted relief it would be a precedent for interfering *every* time a criminal defendant protested that his constitutional rights were invaded. The processes under attack in this case are, allegedly, not the State's usual, orderly, impersonal, legislative and criminal processes.

This is a civil action which was brought *before* any criminal proceeding was begun in the state courts. There is therefore no unseemly clash of courts and no question of Section 2283 of the Judicial Code barring relief.[14] Assuming the truth of the complaint, as the Court *had* to do in order to dismiss the suit, the case is a classic example for raising the shield of the Constitution in protection of a citizen's constitutional rights. Congress recognized the problem in federal-state relations now before us and in the

without a proper executive authority, was essential. A government without a proper executive and judiciary would be the mere trunk of a body, without arms or legs to act or move." 5 Elliott's Debates (Lipp. ed. 1941), p. 159.

13. On World-Wide Communion Sunday in October 1963 three young women, two of whom were Negroes, were arrested for attempting to attend religious services at a Methodist Church in Jackson, Mississippi. They got only as far as the church steps when they were told that they were not welcome. A policeman gave them two minutes to move on. As they started to walk away he told them that they had taken too long. He arrested them. They were indicted for violating Section 2090 (disturbing worship) and Section 2406 (trespass) of the Code of Mississippi. The Police Justice's Court of Jackson sentenced them to a year's imprisonment and fined each $1,000. They removed the

case to the Federal District Court for the Southern District of Mississippi on the ground that their civil rights were violated. The district judge remanded the action back to the State Court. Poole v. City of Jackson, 5 Cir. 1964, No. 21058, pending on appeal on the right to appeal the remand. See also petition for mandamus in Poole v. Barnett, 5 Cir. 1964, No. 21141.

14. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L. Ed. 131 (1915); Looney v. Eastern Texas R. R., 247 U.S. 214, 38 S.Ct. 460, 62 L.Ed. 1084 (1918); American Houses v. Schneider, 211 F.2d 881, 44 A.L.R.2d 1352 (3rd Cir. 1954); Hart & Wechsler, The Federal Courts and the Federal System 847 (1953) Note, Enjoining State Court Proceedings 74 Harv.L.Rev. 726,729 (1961).

Civil Rights Act expressly authorized citizens to protect their constitutional rights by suing in the federal court.

If the Louisiana Anti-Subversion Law is invalid on its face or invalid as applied to the plaintiffs, they should not be subjected to the public indignity of prosecution, the paralysis of earning ability while their case is pending, and the travail of a long, expensive appeal through the state courts to the United States Supreme Court. These are foreseeable and inevitable consequences of unlawful State action of the kind alleged here. Win, lose, or draw in the court of last resort—the individual citizen is a heavy loser when the State abuses its legislative power and criminal processes. The only adequate remedy is for the federal district court to stop the State at the start of its abuse of its governmental power. Whether the State is misusing its power can be determined only after a fair and full hearing. The logical forum for that determination is a federal tribunal.

This Court has jurisdiction. And as a three-judge court it was instituted for just such a case. It should face up to the responsibilities incident to jurisdiction and to doing the job it was designed to do. Much as I regret to say it, and, of course, I mean no personal reflection on my colleagues, whom I esteem highly, I consider this Court's refusal to pass on the constitutional issues and to give the plaintiffs a day in court an indefensible denial of due process.

I turn now to a more detailed analysis of what the case is all about and how the Court has failed to meet its obligations as a federal district court.

### I.

*Is the law unconstitutional on its face?*

A. The plaintiffs make two major contentions with respect to the *per se* unconstitutionality of the Louisiana Anti-Sub-

version Law. First, they contend that the statute violates the freedoms of speech, assembly, and association guaranteed by the First and Fourteenth Amendments. Second, they contend that the law is so vague and indefinite and completely without standards that it violates due process and constitutes an unlawful delegation of legislative power.

B. This Court held a long and formal hearing for the sole purpose of deciding the *per se* validity of the law. At the end of the hearing the majority declared the law constitutional on its face. The Court has now changed directions and, on the assumption that the plaintiffs will be prosecuted, shifted to the state courts responsibility for deciding the federal questions. *The majority opinion does not discuss any of the substantial constitutional issues the complaint raises.*

C. I shall not deal at length with the constitutional arguments, because of the Court's decision to finesse the subject.

Basically, everyone recognizes that the general scope of the statute is within the State's constitutional authority. The difficulty comes from the unlimited commands the statute imposes which conflict with individual rights of free speech and association. See Gibson v. Florida, etc., Committee, 1963, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929. One example will suffice to show the overbreadth of the statutory language. Section 359(2) defines "communist party" so as to include "any organization which in any manner advocates or acts to further the success of the program of world domination of the international communist conspiracy". This Court knows from other litigation, particularly United States v. Louisiana, E.D.La., 225 F.Supp. 353, that the Louisiana legislature regards the movement to increase Negro voting in the State as part of the Communist conspiracy.[15] *All* of the organizations promoting increased Negro voting registra-

---

15. The "Key to Victory, A Manual of Procedure for Registrars of Voters, Police Jurors and Citizens" is a pamphlet prepared by State Senator William M. Rainach and William M. Shaw. Senator Rainach was the first Chairman of Louisiana Joint Legislative Committee to maintain segregation and Mr. Shaw was the first counsel for the Committee. The pamphlet was used to instruct registrars.

tion therefore fall within the definition of "communist party", and any member could be prosecuted under the Louisiana Anti-Subversion Law. The Supreme Court's words in NAACP v. Button are apt here:

"It makes no difference whether such prosecutions or proceedings would actually be commenced. It is enough that a vague and broad statute lends itself to selective enforcement against unpopular causes. We cannot close our eyes to the fact that the militant Negro civil rights movement has engendered the intense resentment and opposition of the politically dominant white community of Virginia; litigation assisted by the NAACP has been bitterly fought. In such circumstances, a statute broadly curtailing group activity leading to litigation may easily become a weapon of oppression, however evenhanded its terms appear. Its mere existence could well freeze out of existence all such activity on behalf of the civil rights of Negro citizens." NAACP v. Button, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405.

In the same case the Supreme Court also said:

"The objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application."

"When, as in this case, the claim is made that particular legislative inquiries and demands infringe substantially upon First and Fourteenth Amendment associational rights of individuals, the courts are called upon to, and must, determine the permissibility of the challenged actions." Gibson v. Florida, etc., Committee, 1963, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929. The constitutional attack affects many more sections of the law than those sections for violation of which the plaintiffs have been threatened with prosecution. The Court completely disregards this fact. The Court should have weighed the statute in the light of federal standards and decided constitutionality one way or the other. I would hold that some of the provisions of the law are unconstitutional on their face.

## II.

*Is the law unconstitutional as applied?*

A. The intervenors, two practicing lawyers in New Orleans, have been active in civil rights cases, representing Negroes in many desegregation cases and representing the American Civil Liberties Union in all sorts of cases. They were arrested. At gunpoint their homes and offices were raided and ransacked by police officers and trustees from the House of Detention acting under the direct supervision of the staff director and the counsel for the State Un-American Activities Committee. The home and office of the director of Southern Conference Educational Fund were also raided. Among the dangerous articles removed was Thoreau's Journal. A truckload of files, membership lists, subscription lists to SCEF's newspaper, correspondence, and records were removed from SCEF's office, destroying its capacity to function. At the time of the arrests, Mr. Pfister, Chairman of the Committee, announced to the press that the raids and arrest resulted from "racial agitation". An able, experienced, and independent-minded district judge of the Criminal District Court for the Parish of Orleans, after hearing evidence, discharged the plaintiffs from arrest on grounds that the arrest warrants were improvidently issued and that there was no reasonable cause for the arrests. Shortly thereafter, the Board of Governors of Louisiana

The pamphlet states and other evidence in the record indicates that "The Communists and the NAACP plan to register and vote every colored person of age in the South." See United States v. Louisiana, E.D.La.1964, 225 F.Supp. 353, 378.

State Bar Association adopted a resolution stating, in part:

"The bar has a responsibility for safeguarding the principles which guarantee due process, and it is a deep concern where procedura! or substantive aspects of search and seizure harass a member of the bar in the proper exercise of his duties.

"Search and seizure of a file in a lawyer's office, unless due process has been adhered to in the strictest sense, is abhorred since such procedure endangers the exercise of constitutional rights of every lawyer and particularly the rights of the client who has placed his trust in him.

"Specifically, this board would urge that police actions by any arm of government scrupulously conform to the best traditions of justice, which guarantee due process to every citizen." New Orleans Times-Picayune, January 3, 1964.

One of the intervenors is an officer of SCEF. The other lawyer is not even a member; he is threatened with prosecution for failing to register as a member of the National Lawyers' Guild.

The plaintiffs say that the purpose of the Southern Conference Educational Fund is to improve economic, social, and cultural standards in the South in accordance with the highest American institutions and ideals. Its principal activity is to promote civil rights for Negroes by education, correspondence, and publication of a newspaper. The plaintiffs deny any connection with communism or subversion.

As emphasized earlier, the plaintiffs contend that, even if the law is valid on its face, the State has searched their homes and offices, seized their property, arrested them, and is about to prosecute them not because they are Communists— they deny any connection with communism—but because their thinking is not compatible with the State's segregation policy. The plaintiffs offer proof in the form of affidavits and witnesses willing to testify.

B. Here again the Court reversed itself. At the first hearing the Court agreed unanimously to receive the evidence at a second hearing. This makes sense. There is no way of deciding whether a law is applied unconstitutionally without hearing evidence as to its application. Evidence was also admissible to show the purpose, operation, and effect of the law. Now, however, the majority has refused to allow the plaintiffs to prove their case by affidavit or by witnesses.

The technical basis for the majority decision was its sustaining of the defendants' motion to dismiss on the ground that "the complaint failed to state a claim upon which relief can be granted". This motion, of course, requires the Court to accept as true all of the allegations in the complaint. In effect the Court held that a citizen has no cause or right of action against the State, to defend federally guaranteed rights and freedoms, when *admittedly* the State is using its Anti-Subversion Law against him, not because he is subversive, but because he advocates civil rights for Negroes. The Court never got around to stating just why the complaint is defective. The fact that the suit is against the State and its officers might affect judicial discretion to withhold the relief prayed for, but it does not affect the plaintiffs' right or cause of action.

Apparently uneasy because of its change of heart and desperately searching for an argument, any argument, the Court came up with a quiddity in keeping with its ratiocinations:

"This court will not gainsay the rule that evidence has been frequently admitted to show unconstitutional application of statutes. * * * but here the very vitals of our constitutional system of government are on the line. * * * If plaintiffs are permitted to introduce evidence * * * respondents would certain-

ly be entitled to follow with evidence * * *. In effect, these litigants, plaintiffs, defendants and intervenors, would indulge in a Star Chamber proceeding with all the 'foldorol' and publicity attendant therewith."

C. Disregarding the perplexing reference to the Star Chamber's "foldorol" and publicity, I understand the Court concedes that in some cases evidence has been admitted to show an unconstitutional application of a valid law, but holds that in this case evidence should not be admitted because: (1) the "vitals" of our Constitution are on the line; (2) the plaintiffs should not be allowed to introduce evidence, for that would entitle the defendants to introduce evidence; (3) a hearing should not be public, or at any rate, a hearing should not be held if there is a likelihood of considerable publicity. This rationale illustrates what I mean by the suggestion, respectfully tendered, that perhaps the decision is the result of a visceral reaction.

In an analogous case, a different panel of this Court held that a section of this very law now before us was unconstitutional as it was applied to the National Association for Advancement of Colored People. State of La. ex rel. Gremillion v. NAACP, E.D.La., 1960, 181 F.Supp. 37, aff'd 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301. "[T]he constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article [or person] is without support in reason * * *." United States v. Carolene Products Co., 1938, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234. As Mr. Justice Holmes has said, "[T]he determination as to [the plaintiffs'] rights turns almost wholly upon the facts to be found. * * * All their constitutional rights, we repeat, depend upon what the facts are found to be. * * * They are not to be forbidden to try those facts before a court of their own choosing if otherwise competent." Prentis v. Atlantic Coast Line Co., 1908, 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150.

All I know about the plaintiffs is what I have read about them in the pleadings and in their written offer of proof. Perhaps the plaintiffs are Communists; perhaps not. Perhaps the State is being falsely accused; perhaps not. I know this, however: the plaintiffs have a right to sue in the federal district court and fair play entitles them to a day in court, to make their proof.

### III.

### *Has the Louisiana Anti-Subversion Law been superseded by congressional laws on the subject?*

A. The plaintiffs say that, judging by the criteria established in Com. of Pennsylvania v. Nelson, 1956, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640, Congress has superseded the Louisiana law through enactment of the Smith Act of 1940, as amended in 1948, 18 U.S.C. § 2385, the Internal Security Act of 1950, 50 U.S.C. § 781 et seq., and the Communist Control Act of 1954, 50 U.S.C. § 841. Nelson established three tests to show congressional intention to supersede state laws on subversion. Applying these tests to this case, the plaintiffs contend, first, that Congress has evidenced this intention by a pervasive, all-embracing program of regulation; second, that the Louisiana law is on a subject in which the national interest is so dominant that the federal system must be assumed to preclude enforcement of state laws on the same subject; third, that enforcement of the state law presents a serious conflict with the federal program.

B. The majority opinion discusses this contention at length although, to have been consistent with its refusal to decide constitutionality, the Court should have refused to discuss supersession. There is no less, and no more, reason to decide one than the other. The Court never comes to grips with the tests Nelson establishes. Instead, the Court simply relies on Uphaus v. Wyman, 1959, 360 U.S. 72, 79 S.Ct. 1040, 3 L.Ed.2d 1090, in

which the Supreme Court stated that Nelson does not prohibit prosecution for sedition against the State itself or prevent the State from protecting itself from sabotage or attempted violence.

C. Uphaus, if I may say so, deferentially and parenthetically, is of small help in our national efforts against Communism but it offers great prospects for disguising unlawful state action against federally protected rights. Nevertheless, the decision may be read as a logical and proper limitation on Nelson when the individuals prosecuted have in fact directed their activities against the State (not against the Nation), as in such incidents as riots, malicious mischief, criminal anarchism, or a conspiracy to dynamite the State house. Thus, there is no question as to the validity of the State Criminal Anarchy Law, LSA–R.S. 14:115. And the Louisiana Supreme Court very properly held that Nelson did not foreclose a prosecution under that statute "which does not necessarily involve seditious acts against the Federal government". State v. Cade, 1963, 244 La. 534, 153 So.2d 382. In the same decision, however, the Louisiana Supreme Court reaffirmed its holding in State v. Jenkins, 1958, 236 La. 300, 107 So.2d 648.

In the Jenkins case the defendant was charged in a bill of information with violating an earlier version of the statute before this Court. The defendant was charged with being a member of the Communist Party knowing it to be a foreign subversive organization as defined in Section 366 of the statute. The prosecution argued that Nelson merely foreclosed acts of sedition against the United States alone. The Louisiana Supreme Court rejected the prosecution's position:

"This contention cannot be sustained. A reading of the majority opinion in the Nelson case leaves no doubt that the ruling covers the entire area of communist activity, since communism in any form, even though directed against a local government, necessarily violates the Smith Act. Thus, in the case at bar,

the charge that the accused has been guilty of subversive activity, in that she was a member of the Communist Party, in its essence includes seditious acts against the government of the United States (even though such violation had not been specifically alleged), for our Communist Control Law (R.S. 14:358–365), like the Federal Communist Control Act, 50 U.S.C. § 841 et seq., contains legislative declarations of fact that the Communist Party is dedicated to the overthrow of all organized government."

Uphaus upheld a contempt conviction of a witness for failure to produce a list of guests at a *public* summer camp suspected of being a communist front. The New Hampshire legislature had authorized the state attorney general to investigate the extent of subversive activities in the state. As the Supreme Court noted in Gibson v. Florida, etc., Committee: "[T]he claim to associational privacy in Uphaus was held to be 'tenuous at best,' 360 U.S., at 80 [79 S.Ct. at 1046, 3 L.Ed.2d 1090], since the disputed list was already a matter of public record by virtue of a generally applicable New Hampshire law requiring that places of accommodation, including the camp in question, maintain a guest register open to public authorities. Thus, this Court noted that the registration statute 'made public at the inception the association they [the guests] now wish to keep private'. 360 U.S., at 81 [79 S.Ct. at 1046, 3 L.Ed.2d 1090]." 372 U.S. at 550, 83 S.Ct. at 895, 9 L.Ed.2d 929.

I have no doubt of the validity of a state legislative investigation into the extent of communist or subversive activities within the state, provided that it is conducted with proper constitutional safeguards and does not impinge on areas preempted by Congress. Whether subversive persons are within a state, whether their activities constitute a threat to the state, and what kind of a threat are of proper concern to a State. Information relative to the subject is necessary for the State to operate "in

areas not reached by Federal authority". Texas v. Southeast Texas Chapter, Tex. Civ.App., 358 S.W.2d 711. Thus Uphaus has been held to sanction state legislative inquiries into such local matters as the qualifications and fitness of the state's employees. Baggett v. Bullitt, W.D. Wash.1963, 215 F.Supp. 439, 448, app. pending, 375 U.S. 808, 84 S.Ct. 60, 11 L. Ed.2d 46. Here the legislation and the State's acts against the plaintiffs go much further than New Hampshire's investigation in Uphaus.

The Louisiana Anti-Subversion Law, unlike the Criminal Anarchy Law, is directed at the same conduct proscribed by Congress. This is evident from the language of the statute. Thus, Section 358 states that the purpose of the legislation is to seek to meet problems created by the "world Communist movement". The preamble declares that "[t]here exists a world Communist movement, directed by the Union of Soviet Socialist Republics and its satellites, which has as its declared objective world control." After describing in some detail the conduct of this "world Communist movement", the law states that "the world Communist movement constitutes a clear and present danger to the citizens of the State of Louisiana. The public good and the general welfare of the citizens of the state require the immediate enactment of this measure." This is precisely the "conduct" which Congress has proscribed in the federal legislation. The preamble to the Internal Security Act, Title 50 § 781, in almost the identical language utilized by the Louisiana legislature, states that the purpose of the federal legislature is likewise to meet the problems of "conduct" engendered by the "world Communist movement".

In Section 358 the legislature explains the state's concern with the conduct proscribed: "Since the State of Louisiana is the location of many of the nation's most vital military establishments, and since it is a producer of many of the most essential products for national defense, the State of Louisiana is a most probable target for those who seek by force and violence to overthrow constitutional government, and is in imminent danger of Communist espionage, infiltration and sabotage." Thus the legislature's concern is with threats to the national interest and national security, with problems relating to the national defense and, indeed, with international relations.

In the years following the Nelson decision not a single state court criminal prosecution for alleged Communist activity has been sustained. See, for example, Commonwealth v. Gilbert, 1956, 334 Mass. 71, 134 N.E.2d 13; Braden v. Commonwealth, 1953, 291 S.W.2d 843 (Kentucky); Commonwealth v. Hood, 1956, 334 Mass. 76, 134 N.E.2d 12; Commonwealth v. Dolsen, 1957, 183 Pa.Super. 339, 132 A.2d 692. These cases dealt with attempted enforcement of state sedition acts based upon charges that the defendants were engaged in communist activities or were members of communist organizations. Even where the charge was carefully *couched in terms of sedition against the state itself,* in applying the doctrines enunciated in Nelson the state courts uniformly held that charges of communist activity of necessity involved conduct proscribed by the federal legislation. For example, the Supreme Court of Massachusetts, in Commonwealth v. Gilbert, pointed out:

> "Although all these things * * * are specified as pertaining to the conspiracy to overthrow the government of this Commonwealth, it is evident that they are the familiar paraphernalia of communist agitation for the overthrow of government in general, and cannot be directed separately and exclusively against the government of this Commonwealth."

These cases all dealt with criminal prosecutions under state sedition laws. However, the Supreme Court of Michigan, in Albertson v. Millard, 1956, 345 Mich. 519, 77 N.W.2d 104, faced directly the impact of the preemption doctrine upon a state law similar to the Louisiana law before this Court. Following the

passage of the federal Internal Security Act several states enacted so-called "Little McCarran Acts", principally among them Alabama, Louisiana, Michigan and Texas. These statutes are attempts to cover the areas governed by the Internal Security Act of 1950 and the Communist Control Act of 1954.

In Albertson, the Michigan Supreme Court struck down the Michigan Act on the ground that it was superseded by the existing federal legislation. The Court held that:

"It is not necessary here to indulge in any extended or lengthy detailed comparison of the specific provisions of the Trucks Act with those of the Pennsylvania act which the United States Supreme Court struck down in its entirety. No question has been raised here pointing to any substantial difference between the two."

Accordingly the Court ruled that:

"[T]he Congress of the United States has occupied the field entered by the Trucks Act to the extent that the Federal acts superseded the enforceability by the State of the provisions of said act."

In describing the impact of the Michigan decision upon the Alabama, Louisiana and Texas statutes, one commentator has written:

"These statutes provide for registration of communist and subversive organizations, set out penalties for sabotage, and impose various disabilities upon registrants, such as exclusion from the ballot and from public office. Other states require registration but do not impose disabilities upon registrants. It is probable that most of the provisions of these statutes have been superseded by federal legislation. The registration statutes duplicate and enlarge the federal registration scheme. Nearly all of them differ from the federal scheme in one or more respects. Some are accompanied by provisions outlawing the Communist Party. Because of the probable conflict of provisions, there is a much clearer case for preemption with reference to these statutes than there is with respect to the sedition statutes invalidated by the Nelson case. Hines v. Davidowitz, in which the Federal Alien Registration Act of 1940 was held to supersede a Pennsylvania alien registration statute, provides a close analogy. Moreover, the breadth and thoroughness of the federal scheme make it easier to infer a preemptive intent on the part of Congress. It is not surprising that the Michigan Supreme Court in Albertson v. Attorney General held that Michigan's comprehensive communist control law had been superseded by the similar provisions of federal communist control measures." Cramton, Supreme Court and State Power to Deal with Subversion and Loyalty, 43 Minn.L.R. 1025, 1034.

The possibility of subversive activities affecting a state directly provides a basis for *bona fide* investigation and state legislation. But prosecutions for sedition based on an accused being a Communist or a member of a Communist front organization have been preempted by Congress. The scheme of federal regulation of Communist activities is so pervasive, the national interest so dominant, and the possibility of federal-state conflict so great that "the conclusion is inescapable that Congress has intended to occupy [this] field of sedition." Commonwealth of Pennsylvania v. Nelson, 350 U.S. at page 504, 76 S.Ct. at page 481, 100 L.Ed. 640.

*Uphaus* reaffirmed *Nelson*; it did not overrule *Nelson*. As long as *Nelson* stands, a State may not define as a crime the same *conduct* Congress proscribes, even though the State's indictment is limited to sedition against the State. There is no doubt as to the intent of the Louisiana legislature: In Section 390 the legislature explains that the statute was necessary because "the federal legislation on this subject matter is either in-

adequate in its scope, or not being effectively enforced".

## IV.

*Should the Court proceed with the trial of this case and, on a proper showing, enjoin enforcement of the law?*

A. The plaintiffs contend that since the law is unconstitutional as written and applied, that a federal district court has the power to proceed with the trial and, on a proper showing, should enjoin the enforcement of the law. The enforcement of the law, they contend, threatens immediate and irreparable injury to their federally protected constitutional rights. The same argument would apply if the Court should hold that congressional legislation superseded the Louisiana Anti-Subversion Law.

B. The Court's position is unclear. The majority opinion states that the "instant case postulates the basic constitutional issue whether threatened prosecution in the state courts * * * may properly be blocked and effectively thwarted by Federal action". But this is not a constitutional question at all. There is not the slightest doubt as to the constitutional power of a federal court to block prosecution in a state court under an unconstitutional statute violative of federally protected rights. We need look only to the Supremacy Clause to resolve any doubt. And Congress set up the three-judge court for the precise purpose of passing on whether a federal district court *should* enjoin enforcement of a state law. Moreover, whether the state law is a civil or criminal statute is immaterial in terms of constitutionality.

Once more I emphasize that the basic error in the Court's decision is its failure to distinguish between the type of case now before it and the run of the mine suit by a criminal offender asking for relief against unlawful State action. In the Civil Rights Act Congress established a distinct federal cause of action in favor of those whose constitutional rights have been invaded. 42 U.S.C.A. §§ 1981, 1983, 1985. As a matter of law,

since such cases involve a federal question, the right existed anyway. The fact that such cases involve a dispute over federally protected freedoms makes the federal court the appropriate forum for settlement of the dispute.

Assuming some latitude for decision under the doctrine of abstention, now developing as nicely as if Dr. Frankenstein were in charge of it, there is still not enough latitude in the doctrine to justify abstention in this case. It is true that generally speaking federal courts are loath to intervene in orderly criminal processes of a State. They do so only in exceptional cases. But here, allegedly, instead of proceeding in an orderly and regular manner, the complaint charges that the State is subverting its Anti-Subversion Law by using it to punish advocates of civil rights.

Exceptional as this situation should be, there are enough cases now, I believe, for one to state that in this circuit our courts have established the following principle:

> Federal courts are slow to interfere with criminal proceedings in the ordinary case; for example, to take an obvious case, when a defendant argues that state proceedings should be halted while the federal court considers the validity of a search and seizure. But when the complaint alleges that a citizen is about to suffer irreparable injury from the State for asserting his basic constitutional rights, federal courts are under a duty to hold a hearing on the complaint and to decide the issues. If the state law is unconstitutional as written or applied, or has been superseded by congressional legislation, the Court should enjoin the enforcement of the law, whether the statute is of a civil or a criminal nature.

C. (1) The landmark authority on the power of a federal court to enjoin state enforcement of a law impairing a federal protected right is Ex Parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, although recognition of

such constitutional power goes back at least to Osborn v. Bank of the United States, 1824, 9 Wheat. 738, 6 L.Ed. 204. In Ex Parte Young the Supreme Court said:

"[I]ndividuals who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence proceedings, *either of a civil or criminal nature*, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action."

As noted in a recent treatise, "The effect of Ex parte Young is * * * to subject the states to the restrictions of the United States Constitution which they might otherwise be able safely to ignore. * * * [I]n perspective the doctrine of Ex parte Young seems indispensable to the establishment of constitutional government and the rule of law." Wright, Federal Courts § 48 (1963).

Jordan v. Hutcheson, 4 Cir. 1963, 323 F.2d 597 is instructive here. In that case three Negro attorneys sued a committee of the Virginia State Legislature, its Chairman, counsel, and a process server of the City of Norfolk. The complaint alleged that under the guise of conducting lawful investigations but actually for the purpose of discouraging Negroes from asserting their civil rights in the courts, the defendants harassed and attempted to intimidate the plaintiffs, raided their offices, and published statements (as in the instant case) naming the plaintiffs as law violators. In a thorough, carefully documented opinion, which relies on a great many decisions of this circuit, the Fourth Circuit reversed the district court which had held that the complaint failed to state a cause of action. Judge Bell, for a unanimous court, said:

"The extent to which the state through its legislative power may intrude upon a citizen's rights becomes a matter for the consideration of the federal courts when such conduct invades the citizen's constitutional privileges. Whereupon the federal courts are commanded to act under the self-executing provisions of the Fourteenth Amendment. We submit it would be impracticable to test the constitutionality of the State's conduct without considering its purpose. * * * *The concept of federalism: i. e., federal respect for state institutions, will not be permitted to shield an invasion of the citizen's constitutional rights.* Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Certainly this principle has not shielded the activities of the executive and judicial branches of the state from interdiction when constitutional rights are involved. * * * Although the federal courts will recognize and respect the state's right to exercise through its legislature broad investigatory powers, nevertheless these powers are not unlimited and it remains the duty of the federal courts to protect the individual's constitutional rights from invasion either by state action or under color thereof. *Especially is this true in the sensitive areas of First Amendment rights and racial discrimination.* Where there exists the clear possibility of an immediate and irreparable injury to such rights by state legislative action the federal courts have exercised their equitable powers including the declaratory judgment and the injunction." (Emphasis added.)

(2) Courts in this circuit have repeatedly enjoined the enforcement of state laws where enforcement infringed on federal rights. They have done so when the statute was unconstitutional on its face and when it was unconstitutional as applied. They have issued the injunction both before and after criminal prosecutions have been started.

In a strikingly analogous situation, in Bush v. Orleans Parish School Board, E.D.La.1961, 194 F.Supp. 182, aff'd

Gremillion v. United States, 368 U.S. 11, 82 S.Ct. 119, 7 L.Ed.2d 75, a three-judge court met directly the question of enjoining state court criminal proceedings and the enforcement of criminal statutes. Louisiana had enacted certain criminal laws designed in their operation, *but not on their face*, to deter Negro citizens from exercising their right to insist upon the desegregation of public education. The statutes created a new crime, "bribery of parents of children", and a companion crime, "intimidation and interference in the operation of schools". As in the instant case, the Attorney General of the State argued that Section 2283 and the policy of comity prohibited the federal court from enjoining these criminal prosecutions. The Court, enjoining a large number of state officers from the Governor on down, said:

> "True, 'it is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions.' Douglas v. Jeannette, 319 U.S. 157, 163, 63 S.Ct. 877, 881, 87 L.Ed. 1324. \* \* \* But the rule cannot be applied mechanically. NAACP v. Bennett, 360 U.S. 471, 79 S.Ct. 1192, 3 L.Ed.2d 1375; cf. Doud v. Hodge, 350 U.S. 485, 76 S.Ct. 491, 100 L.Ed. 577. Special circumstances will sometimes compel a federal court to act. Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131; Pierce v. Society of Sisters, 268 U.S. 510, 45 S. Ct. 571, 69 L.Ed. 1070; Hague v. Committee Industrial Organization, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; \* \* \* This is such a case. The challenged statutes are not ordinary criminal provisions. \* \* \* Placed in context, their mission is all too clear. These are the invidious weapons of a state administration dedicated to scuttling the modest program of desegregation which has been initiated in Orleans Parish. \* \* \* Constitutionally unable to require racial segregation in the public schools, arrested in its plan to close the integrated schools, and

unsuccessful in its boycott of these schools by other means, the State has now marshalled the full force of its criminal law to enforce its social philosophy through the policeman's club." 194 F.Supp. at 185.

In the most recent decision in point, Aelony v. Pace, D.C., —— F.Supp. ——, Judge Tuttle, for a three-judge court held that a Georgia "insurrection statute" and an "unlawful assembly statute" were unconstitutional and granted an injunction forbidding prosecution of the plaintiffs under these laws. I point out that a state "insurrection" statute is preeminently a law enabling a State to protect itself against what the majority here calls the State's "basic right of self-preservation".

Browder v. Gayle, M.D.Ala.1956, 142 F.Supp. 707, aff'd per curiam 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114, is a leading case. Judge Rives, for the Court, held:

> "The defendants, \* \* \* [urge that] the Federal court \* \* \* should, in its discretion as a court of equity, and for reasons of comity, decline to exercise such jurisdiction until the State courts have ruled on the construction and validity of the statutes and ordinances. The short answer is that doctrine has no application where the plaintiffs complain that they are being deprived of constitutional civil rights, for the protection of which the Federal courts have a responsibility as heavy as that which rests on the State courts."

Discussing Browder v. Gayle a panel of the Fifth Circuit (Chief Judge Hutcheson and Judges Tuttle and Jones) said, in a per curiam opinion:

> "That case disposes of the contention that the federal court should not grant an injunction against the application or enforcement of a state statute, the violation of which carries criminal sanctions. This is not such a case as requires the withhold-

ing of federal court action for reason of comity, since for the protection of civil rights of the kind asserted Congress has created a separate and distinct federal cause of action. 42 U.S.C.A. § 1983. Whatever may be the rule as to other threatened prosecutions, the Supreme Court in a case presenting an identical factual issue affirmed the judgment of the trial court in the Browder case in which the same contention was advanced. *To the extent that this is inconsistent with Douglas v. City of Jeannette, Pa., 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, we must consider the earlier case modified.*" Morrison v. Davis, 5 Cir. 1958, 252 F.2d 102, at 103.

In United States v. Wood, 5 Cir. 1961, 295 F.2d 772 a Registrar of Voters in a Mississippi County where there were no Negroes registered, without provocation, pulled out his revolver and ordered a Negro to leave his office. As he was leaving, the Registrar struck him on the back of his head with the revolver. The Negro had conducted a school for voting registration and had encouraged Negroes to register. He was charged with disturbing the peace. The Court of Appeals for this Circuit enjoined his prosecution not just on the violation of his rights but on the ground that the prosecution, "regardless of outcome, will effectively intimidate Negroes in the exercise of their right to vote". 295 F.2d at 777. The Court pointed out that the Civil Rights Act, 42 U.S.C.A. § 1971, expressly authorized injunctive relief against state criminal court proceedings and thus falls squarely within the stated exception to Section 2283. See also Cooper v. Hutchinson, 3 Cir., 1950, 184 F.2d 119, holding that 42 U.S.C.A. § 1983 authorizes an injunction against state court proceedings as an exception to Section 2283.

In City of Houston v. Jas. K. Dobbs Co., 5 Cir. 1956, 232 F.2d 428, the Court affirmed the granting of permanent injunctive relief against the enforcement of a criminal ordinance of the City of Houston. Judge Tuttle, for the Court, said:

"Appellant attacks the jurisdiction of the court on the well-recognized principle that courts will not normally enjoin the enforcement of criminal statutes or ordinances whose constitutionality is challenged. There is an equally well-recognized exception to this rule, as stated in the case cited by the appellant in its brief, Spielman Motor Sales Co., Inc., v. Dodge, 295 U.S. 89 where on page 95, 55 S.Ct. 678, at page 680, 79 L.Ed. 1322, the Court says: 'To justify such interference there must be exceptional circumstances and a clear showing that an *injunction is necessary in order to* afford adequate protection of constitutional rights. * * * The case before us presents a clear illustration of such exceptional circumstances as would make the general rule inapplicable."

See also Denton v. City of Carrollton, Georgia, 5 Cir. 1956, 235 F.2d 481.

Moreover, as the Court held in Bailey v. Patterson, 5 Cir. 1963, 323 F.2d 201, "The law is crystal clear that they were not required to subject themselves to arrest in order to maintain this suit". In McNeese v. Board of Education, 1963, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622, the Supreme Court reviewed the purposes of Section 1983. The Court found that these were its purposes: to override certain kinds of state laws; to provide a remedy where state law was inadequate; to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice; and to provide a remedy in the federal courts supplementary to any remedy any state might have. The Supreme Court said: "We would defeat those purposes if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court". 373 U.S. at 672, 83 S. Ct. at 1436, 10 L.Ed.2d 622.

(3) None of the decisions relied on in the majority opinion present the issue raised here that the State was subverting its laws in order to maintain its segregation policy.

In Watson v. Buck, 1940, 313 U.S. 387, 401, 61 S.Ct. 962, 85 L.Ed. 1416, the Court stated that "exceptional circumstances" and "great and immediate" danger were not shown. Stefanelli v. Minard, 1951, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138, was a run of the mine case in which a defendant asked that a federal court intervene in a state proceeding by suppressing the use of evidence allegedly secured by an unlawful search and seizure. The Court properly refused to interfere, particularly influenced by the consideration that it would be "interven[ing] piecemeal to try collateral issues." 342 U.S. at 123, 72 S.Ct. at 121, 96 L.Ed. 138. In Cleary v. Bolger, 1963, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390, the Court held that federal courts would not enjoin New York police officers from testifying where there was no evidence of an attempt to avoid federal requirements. The majority opinion cites Douglas v. City of Jeannette, Pa., 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, but as stated in Morrison v. Davis, 1958, 252 F.2d 102, 103, the Fifth Circuit gives that case a narrow reading in civil rights cases.

In short, the many decisions in this circuit in which the Court has firmly grasped the nettle argue strongly against the Court's too tender handling of this case.

## V.

Chairman Pfister is quoted as saying that the plaintiffs were racial agitators. If that is true, and if the plaintiffs' modest agitation by mail was motivated only by the plaintiffs' interest in civil rights for Negroes, then, once again, as in Bush v. Orleans Parish School Board, the State has "marshalled the full force of its criminal law to enforce its social philosophy through the policeman's club." Under any rational concept of federalism the federal district court has the primary responsibility and the duty to determine whether a state court proceeding is or is not a disguised effort to maintain the State's unyielding policy of segregation at the expense of the individual citizen's federally guaranteed rights and freedoms.

This Court should get on with its work.