**Sanford ZWICKLER, Plaintiff,**

**v.**

**Aaron E. KOOTA, as District Attorney of the County of Kings, Defendant.**

**No. 66–C–375.**

United States District Court
E. D. New York.

Sept. 19, 1966.

Probable Jurisdiction Noted
Feb. 13, 1967.

See 87 S.Ct. 854.

Rosling, J., dissented.

986

Emanuel Redfield, New York City, for plaintiff.

Louis J. Lefkowitz, Atty. Gen. of New York, for defendant; Samuel A. Hirshowitz, First Asst. Atty. Gen., Irving L. Rollins, Asst. Atty. Gen., of counsel.

Before KAUFMAN, Circuit Judge, ZAVATT, Chief Judge, and ROSLING, District Judge.

ZAVATT, Chief Judge.

On the motion of the plaintiff, a three-judge court was convened, pursuant to 28 U.S.C. § 2284. The plaintiff seeks an order enjoining the defendant from prosecuting him under section 781–b [1] of the New York Penal Law, McKinney's Consol.Laws, c. 40, which the plaintiff contends is violative of the First Amendment as made applicable to the states through the Fourteenth Amendment. The defendant has made a cross-motion to dismiss the amended complaint upon the grounds (1) that this court lacks subject-matter jurisdiction and (2) that the amended complaint fails to state a claim upon which this court can grant relief. For the reasons hereinafter stated, the plaintiff's motion is denied; the defendant's motion is granted.

The New York statute under attack prohibits, among other things, and renders criminal the distribution of anonymous political literature "in quantity." A first offense under the statute is punishable as a misdemeanor; subsequent offenses, however, constitute felonies. At the present time the plaintiff is not distributing anonymously any such political literature nor is he being prosecuted for any such distribution made by him

1. "§ 781–b. Printing or other reproduction of certain political literature

No person shall print, publish, reproduce or distribute in quantity, nor order to be printed, published, reproduced or distributed by any method any handbill, pamphlet, circular, post card, placard or letter for another, which contains any statement, notice, information, allegation or other material concerning any political party, candidate, committee, person, proposition or amendment to the state constitution, whether in favor of or against a political party, candidate, committee, person, proposition or amendment to the state constitution, in connection with any election of public officers, party officials, candidates for nomination for public office, party position, proposition or amendment to the state constitution without also printing or reproducing thereon legibly and in the English language the name and post-office address of the printer thereof and of the person or committee at whose instance or request such handbill, pamphlet, circular, post card, placard or letter is so printed, published, reproduced or distributed, and of the person who ordered such printing, publishing, reproduction or distribution, and no person nor committee shall so print, publish, reproduce or distribute or order to be printed, published, reproduced or distributed any such handbill, pamphlet, circular, post card, placard or letter without also so printing, publishing, or reproducing his or its name and post-office address thereon. A violation of the provisions of this section shall constitute a misdemeanor.

The term 'printer' as used in this section means the principal who or which by independent contractual relationship is responsible directly to the person or committee at whose instance or request a handbill, pamphlet, circular, post card, placard or letter is printed, published, reproduced or distributed by such principal, and does not include a person working for or employed by such a principal. As amended L.1957, c. 717; L.1962, c. 576, eff. Sept. 1, 1962."

prior to the institution of this action. He grounds his amended complaint and his motion for an injunction primarily upon what happened to him during the 1964 political campaign and his apprehension as to what may transpire during 1966 and subsequent political campaigns.

During the 1964 political campaign, the plaintiff distributed an anonymous leaflet [2] critical of a named candidate for reelection to the House of Representatives. He was charged with a violation of section 781–b of the New York Penal Law and found guilty after a trial (at which he presented no evidence) by the Criminal Court of the City of New York, County of Kings, despite his contention that section 781–b violates the Fourteenth Amendment. People v. Zwickler (Crim.Ct., N.Y. City, Kings Co., Feb. 10, 1965, unreported). The judgment of conviction was "unanimously reversed on the facts." People v. Zwickler (Sup.Ct., App.T., Kings Co., April 23, 1965, unreported):

"In our opinion, the People failed to establish that defendant distributed anonymous literature 'in quantity' in violation of the provisions of Section 781(b) [sic] of the Penal Law. We do not reach the question of the constitutionality of the statute involved."

The New York Court of Appeals affirmed without opinion the reversal of the judgment of conviction. People v. Zwickler, 16 N.Y.2d 1069, 266 N.Y.S.2d 140, 213 N.E.2d 467 (1965).

Prior to September 1, 1962, section 781–b applied only to the anonymous printing and reproduction (not the distribution) "in quantity" of political literature in connection with any election of public officers or of candidates for nomination for public office. It did not apply to such literature in connection with any election of party officials or candidates for nomination for a party position. It was not until September 1, 1962 that this section was expanded to apply to *distribution* of such literature "in quantity." L.1962, c. 576, eff. September 1, 1962. Prior to this 1962 amendment, one Robert Clampitt distributed anonymous handbills in connection with a primary election for the selection of a district leader of the Democratic Party. He was

## 2. "REPRESENTATIVE MULTER—EXPLAIN YOUR POSITIONS

### AID TO NASSER

On September 2, 1964, an amendment was proposed to a foreign aid bill (Public Law 480). In substance, it would have cut off all aid to the United Arab Republic. Congressman Multer spoke at length against the amendment, and in his own words, urged its defeat 'as earnestly as I can'. He stated that his position was based on 'humanitarian instinct'. (Congressional Record 20792).

In this respect, the following should be noted

    (a) Congressman Multer's stand permits the diversion of funds by Dictator Nasser to his armaments buildup.

    (b) The United Arab Republic is also a recipient of aid from Communist Russia.

    (c) Egypt is now employing the technical skills of scientists, formerly under the employ of the Nazis.

    (d) Congressman Multer debated against the amendment on the eve of the summit conference held in Cairo by 13 Arab States which are threatening the peace of the Near East and the State of Israel in particular.

### SOVIET ANTI-SEMITISM

The 1964 Foreign Aid bill was passed in the United States Senate with an amendment sponsored by Senator Abraham Ribicoff (D., Conn.) that strongly condemned the anti-Semitic p r a c t i c e s of the Soviet Union. When this issue was brought to the House-Senate conferees, a much more general statement decrying all types of religious bigotry was adopted.

Representative Multer praised this 'watered down' measure on the House floor, and stated:

'While the Senate version did point the finger directly at Soviet Russia, the version as finally adopted, I think, is much the better one.'

'I believe, instead of pointing the finger at the culprit now before the bar of world public opinion where it is being so severely condemned, it is much better that this Congress go on record as it is doing now, against religious persecution wherever it may raise its ugly head.' (Congressional Record 22850).

W H Y  MR. MULTER.  WHY ? ? ? ? ?

running in that primary in opposition to the incumbent, who was seeking redesignation. Clampitt was charged with a violation of section 781–b. At the close of the People's case, Clampitt's motion to dismiss the information was granted and he was discharged. People v. Clampitt, 34 Misc.2d 766, 222 N.Y.S.2d 23 (Ct. Spec.Sess.N.Y.Co.1961). The court held that (1) section 781–b did not apply to anonymous literature in connection with an election of candidates for party office; (2) that it did not apply to the distribution of anonymous political literature and (3) that, even as to those instances to which it did apply, it was "void for indefiniteness and uncertainty." "Just what is meant by 'in quantity' is not defined. How much or how little is 'in quantity'?" "The public should not be compelled to indulge in guessing games where violations of criminal law are concerned." Clampitt, supra, 34 Misc.2d at 768, 222 N.Y.S.2d at 25–26. The "in quantity" aspect of the validity of the section was not passed upon by the New York Court of Appeals in Zwickler, supra. Nor did that court consider the constitutionality of section 781–b under the Fourteenth Amendment to the Constitution of the United States or under Article 1, section 8 of the Constitution of the State of New York.[3]

In his amended complaint, the plaintiff alleges his intention and desire to distribute in the future and "in quantities of more than a thousand copies" the anonymous leaflet he distributed in 1964 [4] "and similar anonymous leaflets, all prepared by and at the instance of a person other than the plaintiff"; to do so "at any time during the election campaign of 1966 and in subsequent election campaigns or in connection with any election of party officials, nomination for public office and party position that may occur subsequent to said election campaign of 1966." The plaintiff does not accuse Aaron E. Koota, the District Attorney of Kings County, New York, of bad faith. Rather, he praises him as a "diligent and conscientious public officer" and presumes to read Mr. Koota's mind by alleging that Mr. Koota "pursuant to his duties intends or will again prosecute the plaintiff for his [intended] acts of distribution" of anonymous political literature. He regards this presumption as "the threat of prosecution" which places him "in fear of exercising his right to make distribution as aforesaid" and which places him "in danger of again being prosecuted therefor." Upon these assumptions he grounds his prayers for relief for (1) a declaration that section 781–b is unconstitutional as violative of the First and Fourteenth Amendments; (2) an injunction restraining the defendant from prosecuting him for his intended distributions of political literature and (3) an injunction pendente lite. From a reading of the amended complaint, it would appear that it has been drafted in the hope of bringing this case within Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). And, as a matter of fact, the memorandum of law of plaintiff's counsel leans heavily upon that opinion.

The threshold question is whether or not this court should temper the exercise of its equitable power to enjoin the defendant. As far back as Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court recognized the power of a federal court to enjoin a threatened prosecution by a state official under a state statute in a case reasonably free from doubt. "[N]o injunction ought to be granted unless in a case reasonably

3. "§ 8. [Freedom of speech and press; criminal prosecutions for libel.]

Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions or indictments for libels, the truth may be given in evidence to the jury; and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact."

4. See note 2.

free from doubt. We think such rule is, and will be, followed by all the judges of the Federal courts." 209 U.S. at 166–167, 28 S.Ct. at 457. Since *Young,* supra, "considerations of federalism have tempered the exercise of equitable power, for the Court has recognized that federal interference with a State's goodfaith administration of its criminal laws is peculiarly inconsistent with our federal framework." *Dombrowski,* supra, 380 U.S. at 484, 85 S.Ct. at 1119–1120. The complaint states a claim under the Civil Rights Act, 28 U.S.C. § 1343(4), since it alleges a deprivation of a right guaranteed by the Fourteenth Amendment. It alleges a case or controversy which is within the adjudicatory power of this court. Douglas v. City of Jeannette, 319 U.S. 157, 162, 63 S.Ct. 877, 880, 87 L.Ed. 1324 (1943). This is not to say, however, that this court necessarily agrees with the plaintiff's contention that "freedom of expression" includes freedom to express one's views by criticizing a named public officer or a named candidate for public office, under the cloak of anonymity. This question was not involved in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 2d 686 (1964). See Bertelsman, Libel and Public Men, 52 A.B.A.J. 657 (July 1966).

The fact that a case is within the adjudicatory power of this court does not necessarily require that its power be exercised. As a general rule and policy a district court, on its own motion, may, in its discretion, refuse to act. "Especially should it do so where its powers are invoked to interfere by injunction with threatened criminal prosecutions in a state court." *Douglas,* supra, 319 U.S. at 162, 63 S.Ct. at 880. In *Douglas,* the plaintiffs, Jehovah's Witnesses, brought suit in a district court to restrain threatened criminal prosecution in a state court for violation of a city ordinance which prohibited the solicitation of orders for merchandise without first procuring a city license, claiming that the city ordinance violated the Fourteenth Amendment. The trial court found that certain of the plaintiffs and other Jehovah's Witnesses had been prosecuted previously by the defendants for distributing literature without having first obtained a license and having paid a tax therefor; that the defendants had declared their intention further to enforce the ordinance against the plaintiffs. But the trial court made no finding of threatened irreparable injury to the plaintiffs. As to this, the Supreme Court said: "we cannot say that the declared intention to institute other prosecutions is sufficient to establish irreparable injury in the circumstances of this case." *Douglas,* supra, 319 U.S. at 164, 63 S.Ct. at 881. On the same day the Court rendered its opinion in Murdock v. Commonwealth of Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292, involving the same city ordinance under which Jehovah's Witnesses were prosecuted for distributing religious literature and soliciting the purchase of religious books and pamphlets. *Murdock* presented a single issue "[T]he constitutionality of an ordinance which as construed and applied requires religious colporteurs to pay a license tax as a condition to the pursuit of their activities." *Murdock,* supra, 319 U.S. at 110, 63 S.Ct. at 873. The convictions of the defendants in the state court were reversed on the ground that the ordinance imposed a tax upon the constitutional rights of the free exercise of religion, freedom of speech and freedom of the press. And because the Court held invalid in *Murdock* the same city ordinance under review in *Douglas,* it affirmed in *Douglas* the reversal by the Court of Appeals of the judgment for the plaintiff in the district court. Since an injunction looks to the future and "in view of the decision rendered today in Murdock, et al. v. Pennsylvania, supra, we find no ground for supposing that the intervention of a federal court, in order to secure petitioners' constitutional rights, will be either necessary or appropriate." *Douglas,* supra, 319 U.S. at 165, 63 S.Ct. at 882. The Court said that "courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution *in*

*good faith* for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guarantees, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction. * * * Where the threatened prosecution is by state officers for alleged violation of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted. Hence the arrest by the federal courts of the processes of the criminal law within the states, and the determination of questions of criminal liability under state law by a federal court of equity, are to be supported *only on a showing of danger of irreparable injury 'both great and immediate.'* " *Douglas,* supra, 319 U.S. at 163–164, 63 S.Ct. at 881. (Emphasis added.)

It may be argued that the principle of abstention illustrated by *Douglas,* supra, is inapposite because, on the very day *Douglas* was decided, the Supreme Court had held the statute involved therein to be unconstitutional in *Murdock,* supra. However, subsequent cases demonstrate that the doctrine of judicial abstention remains fully viable. In Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), decided several years after *Douglas* and involving Fourteenth Amendment rights, a three-judge statutory court permanently enjoined the Attorney General of Virginia and other officials from enforcing certain statutes of the Commonwealth of Virginia which imposed conditions upon the right to make public solicitation of funds and to expend such funds for litigation involving racial segregation. N. A. A. C. P. v. Patty, 159 F.Supp. 503 (E.D.Va.1958).

The state statutes involved had not been authoritatively construed by the courts of Virginia. Nevertheless the three-judge court felt that it should not abstain; that it should pass upon the constitutionality of these statutes because it considered them free from ambiguity and that there was no reasonable interpretation which would render them constitutional. It held certain chapters of the law to be unconstitutional and permanently enjoined their enforcement. As to two chapters the court did not pass upon their constitutionality. Rather, it retained jurisdiction and allowed the complaining parties a reasonable time within which to obtain a state interpretation. On appeal, the Supreme Court vacated the judgment and remanded the case with instructions so as to afford the Virginia courts a reasonable opportunity to construe the statutes, believing as it did, that they were fairly open to interpretation and that the state courts should have been afforded a reasonable opportunity to pass upon them. The Supreme Court did not agree that the statutes left no reasonable room for a construction by the Virginia courts which might avoid in whole or in part the necessity for federal constitutional adjudication or at least materially change the nature of the problem. It referred to the well-established principle of abstention:

"This now well-established procedure is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system. * * * In the service of this doctrine, which this Court has applied in many different contexts, no principle has found more consistent or clear expression than that the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them. * * * This principle does not, of course, involve the abdication of federal jurisdiction, but only the postponement of its exercise; it serves the policy of comity inherent in the doctrine of abstention; and it spares the federal courts of unnecessary constitutional adjudication.

* * * * * *

We do not intimate the slightest view as to what effect any such determinations might have upon the validity of these statutes. All we hold is that these enactments should be exposed to state construction or limiting interpretation before the federal courts are asked to decide upon their constitutionality, so that federal judgment will be based on something that is a complete product of the State, the enactment as phrased by its legislature and as construed by its highest court. * * * And of course we shall not assume that the Virginia courts will not do their full duty in judging these statutes in light of state and federal constitutional requirements." 360 U.S. 176–178, 79 S.Ct. 1030–1031.

The abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law. It involves a discretionary exercise of a court's equity powers. In Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), the Supreme Court reversed a three-judge United States District Court which abstained and refused to pass upon the constitutionality of a state statute. Whether the court should have abstained, said the Supreme Court, depended upon "whether there exist the 'special circumstances,' * * * prerequisite to its application * * *." It found that such "special circumstances" were not present and, therefore, that the three-judge court should not have abstained from passing upon the constitutional question.

In Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, the Supreme Court reversed a three-judge statutory court which had dismissed the complaint in an action under the Civil Rights Act to restrain the defendants from prosecuting the plaintiffs for alleged violations of the Louisiana Subversive Activities and Communist Control Law and Communist Propaganda Control Law. Here, the Supreme Court looked for special circumstances to justify the exercise of federal court jurisdiction rather than for special circumstances to justify a federal court in abstaining to exercise its jurisdiction:

"And in a variety of other contexts the Court has found no special circumstances to warrant cutting short the normal adjudication of constitutional defenses in the course of a criminal prosecution." 380 U.S. at 485, 85 S.Ct. at 1120.

It found the presence of such special circumstances in Dombrowski and, therefore, reversed the judgment of the three-judge court.

The complaint in Dombrowski, supported by affidavits and a written offer of proof, alleged that the threats to enforce the statutes were not made with any expectation of securing valid convictions but, rather, were part of a plan to employ arrests, seizures and threats of prosecution under color of the statutes to harass the appellants and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of the citizens of Louisiana. The Supreme Court noted probable jurisdiction in order to resolve a seeming conflict between the decision of the lower court in 227 F.Supp. 556 and the later decision of the Supreme Court in Baggett v. Bullitt, supra, "and to settle important questions concerning federal injunctions against state criminal prosecutions threatening constitutionally protected expression." 380 U.S. at 483, 85 S.Ct. at 1119. There, the good faith of the enforcement officers was attacked. The appellants claimed that these officers invoked and threatened to continue to invoke criminal process without any hope of ultimate success, but only to discourage the civil rights activities of the appellants. Dombrowski and others were arrested by Louisiana state and local police and charged with violations of the two state statutes. Their offices were raided and their files and records seized. At gunpoint their homes and offices were raided and ransacked by police officers and trustees of the House of Detention, acting under the direct supervision of the staff director, and the counsel for the

State Un-American Activities Committee. The home and office of the director of the Southern Conference Educational Fund were also raided. Judge Wisdom's dissenting opinion in the court below observed that "Among the dangerous articles removed was Thoreau's Journal." Although the court granted a motion to suppress the seized evidence, Louisiana officials continued to threaten prosecution. The grand jury was summoned to hear evidence looking to indictments of the individuals appellants. Despite a temporary restraining order issued by Judge Wisdom, the district court dissolved that order and dismissed the complaint. Thereafter, the grand jury returned indictments under the two state statutes against the individual appellants. The appellees repeated announcements that the appellant organization was a subversive or Communist-front organization; that its members must register or be prosecuted—these announcements, together with the other events preceding them, frightened off potential members and contributors.

Under the "special circumstances" present in *Dombrowski,* the Supreme Court held that this was not a case for the application of the doctrine of abstention:

> "We hold the abstention doctrine is inappropriate for cases *such as the present one* where, unlike Douglas v. City of Jeannette, statutes are justifiably attacked on their face as abridging free expression, or as applied for the purpose of discouraging protected activities." 380 U.S. 489–490, 85 S.Ct. at 1122. (Emphasis added.)

It found that "the allegations in this complaint depict the situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights." "Here, no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution * * *." 380 U.S. at 485, 491, 85 S.Ct. at 1120, 1123. But the Court did not repudiate the doctrine of abstention in all cases involving Fourteenth Amendment rights. Where cases do not involve "special circumstances" to justify the exercise of a federal court's equitable powers, it quoted with approval from *Douglas,* supra:

> "In such cases it does not appear that the plaintiffs 'have been threatened with any injury other than that incidental to every criminal proceeding brought lawfully and in good faith, or that a federal court of equity by withdrawing the determination of guilt from the state courts could rightly afford petitioners any protection which they could not secure by prompt trial and appeal pursued to this Court.'" 380 U.S. at 485, 85 S.Ct. at 1120.

The sound principle of abstention alluded to in *Douglas,* supra, is questioned by the plaintiff whenever there is a threat or assumed threat of state prosecution in violation of what the plaintiff terms the "right of expression." The plaintiff assumes that the "right of expression" directed at named political personages embraces the right to express opinions as to such persons behind the mask of anonymity. He points to *Dombrowski,* supra, to support his contention that the defendant in the instant case should be enjoined by this court from prosecuting him in the future for distributing anonymous political literature.

This court does not find present here the "special circumstances" to justify the exercise of federal judicial equity power. There is no suggestion that the alleged threatened prosecution of the plaintiff in the instant case will be undertaken in bad faith or that the plaintiff's defense to any such prosecution will not assure him adequate vindication of his alleged constitutional rights. In fact, a lower New York state court has already held the statute in question to be unconstitutional for vagueness, People v. Clampitt, supra, and this plaintiff's conviction in 1964 was reversed in People v. Zwickler, supra, for failure of proof that he had distributed anonymous political literature "in quantity." This court has no reason to believe that a court, as enlightened and distinguished as the New York State Court of Appeals, will not assure this

plaintiff adequate vindication of his constitutional rights.

There is available to the plaintiff a state remedy short of asserting defenses in a criminal prosecution. He may, if he desires, institute an action in the state court for a declaratory judgment. N.Y. CPLR § 3001. De Veau v. Braisted, 5 App.Div.2d 603, 174 N.Y.S.2d 596 (2d Dep't 1958), aff'd, 5 N.Y.2d 236, 183 N.Y.S.2d 793, 157 N.E.2d 165 (1959), aff'd, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed. 2d 1109 (1960). Should "special circumstances" arise which would not justify further abstention, the parties, of course, may seek appropriate relief in the federal courts.

The plaintiff's motion for a preliminary injunction is denied. The defendant's motion to dismiss the amended complaint is granted. Settle an order consistent herewith on or before ten (10) days from the date hereof.

IRVING R. KAUFMAN, Circuit Judge (concurring in opinion of Judge ZAVATT):

In light of Judge Rosling's dissent, I feel that it is necessary for me to state briefly my understanding of the majority opinion so that its meaning is not lost. The majority lays down no broad rule of federal abstention in cases where freedom of expression is threatened, but rather follows those principles enunciated by the Supreme Court in the *Dombrowski* case. The Court there recognized that "federal interference with a State's good-faith administration of its criminal laws is peculiarly inconsistent with our federal framework. * * * [T]he mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify a disruption of orderly state proceedings." The facts presented in the appeal before us offer a vivid contrast to those alleged in *Dombrowski*. The illegal raids and threats of prosecution made by Louisiana officials in *Dombrowski,* resembled only too closely those tactics employed by totalitarian regimes dedicated to suppressing freedom of ex-

pression. In light of the oppressive circumstances presented in that case, the Supreme Court could well infer that "the State's criminal prosecution will not assure adequate vindication of constitutional rights."

But, such inference cannot be reasonably drawn in the case now before us. Zwickler does not charge that New York state officials have harassed him, or even that he has been threatened with prosecution. Rather he fears that the District Attorney will again, in good faith, prosecute him—a fear that should be somewhat alleviated by the fact that Zwickler's conviction was unanimously reversed by the New York courts in 1965. And, there is no basis for inferring that New York's criminal processes, if invoked, will not assure Zwickler adequate vindication of his constitutional rights. Moreover, Zwickler's exercise of what he believes to be his rights, need not be "chilled." He need not wait for state officials to act before he can challenge the constitutionality of § 781-b. Rather he may take the initiative and institute a declaratory judgment action in the New York courts; and, in addition he may seek expedition of his case if there is any threat of prosecution—though such a threat seems unreal in light of Zwickler's previous successful encounter with the statute. The Supreme Court's decision in Baggett v. Bullitt did not, as Judge Rosling suggests, reject for all time resort to the state's declaratory judgment procedures. Rather, the Court found that "In *these circumstances* [presented in *Baggett*] it is difficult to see how an abstract construction of the challenged terms * * * in a declaratory judgment action could eliminate the vagueness of these terms. It is fictional to believe that anything less than *extensive adjudications,* under the impact of a variety of factual situations, could bring the oath within the bounds of permissible constitutional certainty." 377 U.S. 378, 84 S.Ct. 1326. (Emphasis added.) The facts presented in the case before us differ radically. I see no reason to believe that "extensive adjudications" would be required were

994

Zwickler to challenge § 781–b in a declaratory judgment act. And the State courts can adjudicate, as rapidly as the Federal courts, Zwickler's simple contention that the statute is unconstitutional because it is overbroad.

In light of all of these factors, the case now before us does not present those special circumstances found in *Dombrowski* and *Baggett*. Rather, the facts in this case clearly indicate that our discretion will be exercised in the wisest manner if, as is consistent with our federal framework, we permit the courts of the state to deal first with the question raised by Zwickler.

## DISSENTING OPINION

ROSLING, District Judge.

This dissent is only from so much of the majority's holding that the basic, but residual, question of constitutionality of Penal Law § 781–b should be passed back to the state courts for adjudication while we abstain. The question of constitutionality, however, is necessarily reached if the dissent correctly holds that we must not abstain. That the provision is unconstitutional for overbreadth the Attorney General in his brief substantially acknowledges by citing the legislative history of the most recent (1962) amendment of the provision as basis for a judicial, possibly, a case by case, narrowing of the law to a constitutional dimension. What he proposes is that the courts by decisional law do what the New York State legislature did by amendment after the state Court of Appeals had stricken down in People v. Mishkin, 17 A.D.2d 243, 234 N.Y.S.2d 342 (1st Dept.1962), aff'd 15 N.Y.2d 671, 255 N.Y.S.2d 881, 204 N.E.2d 209 (1964), the overbroad Section 330, subd. 2 of the General Business Law.

The statute construed in Mishkin contained a self-identification requirement which swept within its scope *all* publications without distinguishing between that which by reason of its content had forfeited the protection the First Amendment affords, and other matter not thus disentitled. The post-Mishkin amendment, still untested by the courts, expressly restricts its compelled self-identification to what, hopefully, has forfeited constitutional protection as hard core pornography. Mishkin in turn rests on Talley v. State of California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559, which held that a city ordinance (Los Angeles) barring distribution of any handbill in any place under any circumstances unless the provenance thereof was noted thereon was unconstitutional as abridging freedom of speech and press secured against such invasion by the First and Fourteenth Amendments. I do not find in the Talley holding any express or sharply implied qualification of the principle announced that would permit a judicial pruning of a statute thus overbroad in the First Amendment area, so that what remains may be rendered viable.

New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), admonishes those in the public eye that constitutional immunity extends to the writers of all that is written in criticism of their public action, even though falsely written, absent a showing of actual malice.

Mills v. State of Alabama, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484, denies to the state authority to censor by penalizing writings made so close to an election, that no time is available for answer. That the voters may be misled by such ex parte and unexposed slanders is at once apparent. But, according to Mills, the policing of the truth to insure that the voter makes a choice uninfluenced by belated falsehood or distortion is not a function of government. Nor does it become the function of government to do so upon a showing that public officials are aided by private persons, however honorable and honorably motivated. Cf. Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). Nor should we by abstention fail to declare, if precedent has thus determined, unconstitutional a law so patently overbroad.

Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964), comments (p. 373) that "[w]ell-intention-

ed prosecutors and judicial safeguards do not neutralize the vice of a vague law." Justice White, writing for the court, rejected abstention as inappropriate, for "[i]t is fictional to believe that anything less than extensive adjudications, under the impact of a variety of factual situations, would bring the oath [penalties for nonjuring teachers was involved] within the bounds of constitutional certainty. Abstention does not require this." [Id. at p. 378, 84 S.Ct. at p. 1326]

Rejected too, by Baggett was resort to a state tribunal for a declaratory judgment on the issue of constitutionality, a suggestion advanced by the majority here. The slow, particularistic process of litigation in state forums and its cost are noted further by Justice White as "inhibit[ing] the exercise of First Amendment freedoms." [id. at pp. 378, 379, 84 S.Ct. at p. 1326]

Dombrowski v Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), an action brought under the Civil Rights Act, Rev.Statute § 1979, 42 U.S.C. § 1983 (1958 ed.) is discussed at length and passim by the majority of this panel, and is read by them, although not expressly so stated in the opinion, as authorizing the retention of jurisdiction only upon a showing of a context of threats, violence and disorders which by harassment discourages those petitioning this court for relief, from attempting to vindicate their constitutional rights through proceedings in the state courts. Dombrowski strongly and expressly upheld the Baggett principles [id. 491, 85 S.Ct. 1123], yet Baggett involved *no* claims of acts of *violence* or of *indignities* visited upon the nonjuring teachers who pressed their suit in the federal forum.

The majority here, it would appear, have read into the principles for which Dombrowski stands, the accidental and adventitious environment of violence, and assigned to it a role integral to the ratio decidendi. Dombrowski, however, does not justify such gloss.

Thus Dombrowski, at p. 486, 85 S.Ct. at p. 1121 "we have consistently allowed attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity."

And, quoting NAACP v. Button, 371 U.S. 415 at p. 433, 83 S.Ct. 328, 9 L.Ed.2d 405, it approves the statement in that opinion which speaks of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." [id. 380 U.S. 487, 85 S.Ct. 1121]

Dombrowski decries delay in "vindication of freedom of expression await[ing] the outcome of protracted litigation", and even more forcefully rejects the contention "that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of prosecution, unaffected by the prospect of its success or failure." [id. at p. 487, 85 S.Ct. at p. 1121]

But, most significantly, Dombrowski distinguishes its own context from that of Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1944), in which there was no atmosphere of state violence or breakdown of the judicial process, the distinction being on grounds which make clear that although the presence of violence and other disruptive circumstances may dictate retention, their absence does not, conversely, dictate abstention.

Dombrowski declares [380 U.S. pp. 489–490, 85 S.Ct. p. 1122]: "We hold the abstention doctrine is inappropriate for cases such as the present one where, unlike Douglas v. City of Jeannette, statutes are justifiably attacked *on their face* or as *applied* for the purpose of discouraging activities." [Emphasis supplied] Only the second of the alternatives cited contemplates violence as of material relevance. The first alternative, instanced by our proceeding, needs only a statute void on its face as the pivotal condition for retention of a First Amendment suit where chilling is a natural consequence

of our abstention. See excerpt from Baggett, supra p. 994.

Finally, and in my view conclusive upon us as obliging us to retain, is the statement in Dombrowski which declares the sequence of the Federal and State procedures when the statute is thus overbroad on its face.

"The State must, if it is to invoke the statutes after injunctive relief has been sought, assume the burden of obtaining a permissible narrow construction in a noncriminal proceeding *before* it may seek modification of the injunction to permit future prosecutions. * * * Our view of the proper operation of the vagueness doctrine does not preclude district courts from modifying injunctions to permit prosecutions in light of subsequent state court interpretation clarifying the application of the statute to particular conduct." (380 U.S. at 491–492, 85 S.Ct. at 1123) [Emphasis supplied]

The Dombrowski principle is summed up in forthright language (p. 494, 85 S.Ct. p. 1125) taking note of life's realities and the fact that not all men are willing to accept martyrdom. It reads:

"So long as the statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one. Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression."

Once the thesis is accepted that § 781–b is invalid, at least for overbreadth, in its indiscriminate application to both the constitutionally protected writing which, though anonymous, may be circulated withut penalty, and that which by reason of malicious falsehood must certify its origin or be in violation, the question arises as to the one who shall so assess the contents and at what stage this shall be done. For answer § 781–b must be read in association with Executive Law,

McKinney's Consol.Laws, c. 18, § 69. That provision at the same time authorizes as it obligates, the Attorney General to investigate crimes against the Elective franchise. The sifting process which he, through his deputies, engages in, to implement § 781–b in its judicially narrowed dimension, may with all good heart be intended only for the culpable. Its chill will, nevertheless, be felt in a prior restraint by those whose writings, though not self-identified, may be emitted freely, and should be, not only without penalty, but equally without fear of penalty. Chilling that freedom is impermissible censorship. See People v. Clampitt, 34 Misc.2d 766, 222 N.Y.S.2d 23; North End Democratic Club v. Attorney General, 31 Misc.2d 1000, 222 N.Y.S.2d 9; People v. Zwickler (Crim.Ct., N.Y.City, Kings Co., Feb. 10, 1965, unreported) "[j]udgment of conviction unanimously reversed on the facts," (Sup.Ct., App.T., 2d Dept., April 23, 1965, unreported), aff'd without opinion 16 N.Y.2d 1069, 266 N.Y.S.2d 140, 213 N.E.2d 467 (1965).

Justice Black in Talley at p. 539 of 80 S.Ct. cites as significant Hallam's Constitutional History of England and the Letters of Junius. The organ tones of Milton two centuries earlier in Areopagitica identify the wellsprings at which these authors surely drank.

"For who knows not," the mighty advocate asked, "that Truth is strong next to the Almighty?" and gave his own answer. "She needs no policies, no stratagems, nor licensings to make her victorious; those are the shifts and the defences that error uses against her power."

I would grant the plaintiff's motion declaring § 781–b unconstitutional as in violation of the First and Fourteenth Amendments to the Constitution of the United States and enjoining its enforcement.